### STATE OF CONNECTICUT *v.* MICHAEL ANCONA
### (SC 16779)

Sullivan, C. J., and Norcott, Katz, Palmer and Zarella, Js.

Argued January 14—officially released August 24, 2004

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, was *James E. Thomas*, state's attorney, for the appellant (state).

*Jacob Wieselman*, with whom, on the brief, were *Julie D. Blake, Brenda M. Hamilton* and *Nancy Kase O'Brasky*, for the appellee (defendant).

*Opinion*

PALMER, J. A jury found the defendant, Michael Ancona, guilty of fabricating physical evidence in viola-

tion of General Statutes § 53a-155 (a) (2),[1] conspiracy to fabricate physical evidence in violation of § 53a-155 (a) (2) and General Statutes § 53a-48 (a),[2] and falsely reporting an incident in violation of General Statutes (Rev. to 1997) § 53a-180 (a) (3) (C).[3] The trial court rendered judgment in accordance with the jury verdict,[4] from which the defendant appealed to the Appellate Court. On appeal, the Appellate Court concluded that the defendant was deprived of his due process right to a fair trial[5] and was entitled to a new trial on the basis of certain prosecutorial improprieties that had occurred during closing arguments. See *State* v. *Ancona*, 69 Conn. App. 29, 30, 41, 797 A.2d 1138 (2002). We granted the state's petition for certification to appeal limited to the

---

[1] General Statutes § 53a-155 (a) provides in relevant part: "A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he . . . (2) makes, presents or uses any record, document or thing knowing it to be false and with purpose to mislead a public servant who is or may be engaged in such official proceeding."

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[3] General Statutes (Rev. to 1997) § 53a-180 (a) provides in relevant part: "A person is guilty of falsely reporting an incident when, knowing the information reported, conveyed or circulated to be false or baseless, he . . . (3) gratuitously reports to a law enforcement officer or agency . . . (C) false information relating to an actual offense or incident or to the alleged implication of some person therein."

[4] The trial court sentenced the defendant to a total effective term of five years imprisonment, execution suspended after six months, and four years of conditional discharge. The trial court also ordered the defendant to pay fines totaling $5000.

[5] On appeal to the Appellate Court, the defendant claimed a violation of his rights under the fifth, sixth and fourteenth amendments to the United States constitution and article first, §§ 8 and 19, of the Connecticut constitution. The Appellate Court declined to review the defendant's state constitutional claims, however, because the defendant had failed to provide an independent analysis of those claims. *State* v. *Ancona*, 69 Conn. App. 29, 31 n.1, 797 A.2d 1138 (2002).

following issue: "Did the Appellate Court properly conclude that prosecutorial misconduct in the [state's attorney's] closing and rebuttal arguments deprived the defendant of due process of law?" *State* v. *Ancona*, 260 Conn. 928, 798 A.2d 970 (2002). We answer the certified question in the negative and, therefore, reverse the judgment of the Appellate Court.

## I

### THE OPINION OF THE APPELLATE COURT

The opinion of the Appellate Court contains the following factual and procedural summary of the case. "This [case] arises out of a criminal investigation into the police tactics used to make an arrest on February 14, 1997. At that time, the defendant was a member of the Hartford police department. The jury reasonably could have found the following facts. On the evening of February 14, 1997, several officers from the Hartford police department, including the defendant, engaged in a high speed chase. Bloomfield police officers [including two rookie officers, Rebecca Michaud and Arthur Fredericks] joined the pursuit after being notified that the truck being chased, which was driven by James Wilson, had entered their town. The chase ended in Bloomfield where Officer Michael Driscoll of the Bloomfield police department removed Wilson from the vehicle. As Driscoll removed Wilson, the defendant, who was standing nearby, ducked and stepped back to avoid a blow from Wilson's hand. Several police officers, including the defendant [and Hugh O'Callaghan and Jacqueline Middleton, also of the Hartford police department], used force to subdue Wilson. An investigation into the police conduct followed. Reports and statements of seasoned police officers from both police departments conflicted with [those of] rookie police officers with regard to which officers were involved in subduing Wilson and the details concerning the amount

of force used to subdue Wilson. Furthermore, testimony of the seasoned police officers about the incident conflicted with that of the rookie police officers . . . .

"The defendant was charged under two separate informations. The first information charged him with assault in the second degree with a firearm in violation of General Statutes § 53a-60a[6] and assault in the second degree in violation of General Statutes § 53a-60 (a) (2).[7] The second information charged the defendant with fabricating physical evidence . . . conspiracy to fabricate physical evidence . . . and falsely reporting an incident . . . . The jury found the defendant not guilty of the assault counts in the first information [but] found the defendant guilty of all three counts of the second information. . . .

"[On appeal to the Appellate Court] [t]he defendant claim[ed] that the [state's attorney had] made numerous improper statements during closing and rebuttal arguments that were so egregious that he was deprived of his due process right to a fair trial . . . . Specifically, the defendant argue[d] that during the [state's attorney's] closing and rebuttal arguments, the [state's attorney] improperly (1) displayed blue tinted sunglasses that had not been admitted in evidence . . . (2) introduced the concept of the 'blue code' [of silence], (3) offered his opinion that the seasoned officers' testimony was unbelievable, (4) vouched for the credibility of the

---

[6] General Statutes § 53a-60a provides in relevant part: "(a) A person is guilty of assault in the second degree with a firearm when he commits assault in the second degree as provided in section 53a-60, and in the commission of such offense he uses or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, machine gun, shotgun, rifle or other firearm. . . ."

[7] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm . . . ."

rookie [officers] . . . (5) blamed the seasoned officers for failing to help [Wilson], (6) posed hypotheticals to the jurors to encourage them to relate to [Wilson], (7) displayed a badge that was not part of the evidence and (8) appealed to the jurors' emotions and inflamed the passions of the jurors." *State* v. *Ancona,* supra, 69 Conn. App. 30–32.

The Appellate Court summarized the factual basis of the defendant's claims more particularly as follows. "In closing argument, the [state's attorney] stated that he believed that there were a number of factors showing that there was criminal conduct in this case. He held up a pair of blue tinted sunglasses to demonstrate the concept of a 'blue code' [of silence], whereby police officers 'avoid ratting on a brother officer.'[8] He proceeded to credit the testimony of rookie officers and to discredit the testimony of the seasoned officers. The [state's attorney] next posed a hypothetical to illustrate his opinion that the officers would have seen everything if Wilson, rather than a fellow officer, had been the defendant in the case.[9] He accused the officers who hit

---

[8] The state's attorney commented: "There are a number of factors that I believe that shows that this was criminal conduct . . . . And the first is the way that some of the police officers testified in this particular case. . . . [T]hey knew what was going on behind the truck. They knew and they didn't want to see it. That's why they came in and testified the way that they did.

"Some of them were wearing these that night: blue tinted [sun]glasses. A police officer can do no wrong or at least, if he does, they don't want to see it. They are viewing it through blue tinted glasses. A police officer has a code. Don't ask me why, but there's a code: avoid ratting on a brother officer. And some of them did that that night, either consciously or unconsciously. They didn't want to see what was going on behind the truck. The ones that did testified, 'Well, yeah, there was a struggle and I saw arms but I can't tell who hit whom or what happened.' "

[9] The state's attorney remarked: "I ask you this: If the officers had come up on that scene and Mr. Wilson had been on top of one of the officers, do you think any of these officers would have had any difficulty in testifying as to everything that they saw Mr. Wilson do? I submit to you they wouldn't [have]. They would have seen every blow, every move. But they didn't see what [the defendant] and Officer Middleton did that night, except the two

Wilson of perverting the law and abusing their discretion.[10] . . . He challenged the jury to 'protect those officers that are attempting to properly use that discretion and . . . to punish those officers who do not and who use their badge to commit a crime.' In the [state's attorney's] rebuttal, he discredited the statement and testimony of the defendant. He explained that the jury was to evaluate the totality of the evidence and that even if the state's witnesses were 'liars,' there was still no reasonable doubt. After emphasizing witness testi-

---

rookies, the two rookies who hadn't been steeped in this blue code yet. They both testified as to what they [had] observed.

"[The rookie officer] said that she had her gun out, she observed this pile . . . and she said to herself, 'You know, something's wrong, it's taking too long to handcuff these people so—or this person,' and she holsters her weapon and approaches to put handcuffs on. She took her handcuffs out. She approaches. That's reasonable conduct. That's what should have been done.

"What happens to her? She's pulled back by a more seasoned officer. Why? It's proper to go to the aid of officers who are trying to put someone in custody. Why did [the more seasoned officer] pull her back from doing that? There's one reason: [because] he knew what was going on. They were assaulting Mr. Wilson on the ground. He didn't want [the rookie officer] involved in that."

[10] The state's attorney stated: "These are officers [who] are sworn to uphold the law. What did they do? They perverted—I submit to you if it had not been for that snippet of videotape, you, in fact, would be sitting on the trial of . . . Wilson and not [the defendant]. These officers perverted the law. They assaulted this man.

"Obviously, he's not the best citizen we have. And he gave the officers the cause to chase him, to have to run him down, to forcefully have to bring him out of the vehicle. But he did not deserve what happened to him that night, and he certainly didn't deserve to be brought into court on false charges. And that's exactly what would have happened if we didn't have that videotape.

"As I said in my opening remarks, police officers have a hard job and they deserve our respect, they deserve our cooperation. And when they're in that gray area, they deserve some consideration. How much force to use, when to use it. They have to have a certain amount of discretion. But we have to protect those officers that are attempting to properly use that discretion and we have to punish those officers who do not and who use their badge to commit a crime. And I submit to you that that's exactly what happened in this case. And I would ask you to return a verdict of guilty on all the counts."

mony and stating his interpretation of the inferences that could be drawn,[11] the [state's attorney] blamed the seasoned officers for failing to prevent the assault on Wilson.[12] [The state's attorney] further posed a series of rhetorical questions to the jury about the police officers' conduct.[13] To close his rebuttal [argument], the [state's attorney] stated: 'There's a monument in Washington

[11] The state's attorney argued: "And I don't believe for a minute that all these officers were either true to themselves or spoke the whole truth. Perhaps they don't know what it is. Perhaps they're afraid to address it. But look at what they didn't say. There wasn't one officer [who] got on the stand and said, 'You know, I saw exactly what went on. This guy was struggling. What they did was proper.' They all turned away at one point or another. 'Well, yeah, I saw something going on but I don't know what it was. Yeah, he was struggling but I don't know what exactly he was doing.'"

[12] The state's attorney remarked: "None of the other officers had the—I say 'guts,' the wherewithal to get into this and stop the assault. They didn't want to see it. It is a brother police officer. They don't want to know. It's sort of like seeing your brother or sister doing something wrong. You really don't want to have to deal with that. And, unfortunately, that's what came across in their testimony. Do I blame the four? Well, yeah, I do because they take an oath to uphold the law and they should have upheld the law that night and stop[ped] what was going on, and they didn't do it. And the rookie is the only one [who] had enough nerve to confront the situation and say, 'Hey, what are you doing?' You heard his description. Wilson is down on the ground, flat out, and his face to one side, and he gets whacked in the head."

[13] The state's attorney remarked: "A lot of the officers that were there that night weren't involved in the search for the truth and when they testified here, they weren't involved in the search for the truth. I'm still naive enough to think that that's what trials are all about, trying to find out the truth. I think collectively you can use these witnesses' testimony to determine what happened that night. And if this was proper police procedure, why isn't it in these reports? You'll have Officer Middleton's report. You'll have Officer O'Callaghan's report. You can see the threads in here, they're all the same: that Wilson was hurt going down, that he resisted, that he swung, that he punched Officer O'Callaghan. It didn't happen.

"And if he wasn't assaulted that night, why did these officers disgrace their badges by filing false reports, by becoming involved in a criminal conspiracy to cover this up? And to have a man who decidedly was not innocent, but [who] was not guilty of assaulting a police officer as they described it, why would they have this innocent man arrested on a charge that he didn't commit and get the wheels of justice grinding against him if what they did was not criminal that night?"

that's set up that has about fourteen [thousand] or fifteen thousand plaques on it of officers who died in the line of duty. They died to protect us and they died to honor this, their badge.[14] What those officers did that night is a disgrace. It's a disgrace to their badge. Don't let them get away with it.' " (Citation omitted.) Id., 32–35. With respect to the comments that the state's attorney had made during closing and rebuttal arguments, defense counsel objected only to the state's attorney act of "displaying his badge" after he had referred to the monument in Washington[15] and one other passage that is not relevant to the merits of this appeal.

Before addressing the merits of the defendant's appeal, the Appellate Court noted that the defendant had failed to object to most of the comments of the state's attorney that the defendant had challenged on appeal. The Appellate Court further noted that the defendant had failed to seek review of his unpreserved claims under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[16] in his principal brief; rather, the defendant sought review under *Golding* for the first time in his reply brief. *State* v. *Ancona*, supra, 69 Conn.

---

[14] The state's attorney apparently held up a badge that had been issued to the state's attorney himself.

[15] Defense counsel stated in relevant part: "I object to [the state's attorney's] displaying his badge and essentially putting these jurors as the representatives of the community at large. The jurors may not be asked to protect the community or to serve as judicial officers. They're here to decide the guilt of this individual. And saying that somehow the impact of this case will help preserve the integrity of our society and of law enforcement, I think, is prejudicial and objectionable, and cannot be cured by an instruction."

[16] In *Golding*, this court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

App. 36 n.10. Invoking the well established principle that our appellate courts generally will not review claims raised initially in a reply brief; e.g., *State* v. *Russo*, 259 Conn. 436, 440 n.6, 790 A.2d 1132, cert. denied, 537 U.S. 879, 123 S. Ct. 79, 154 L. Ed. 2d 134 (2002); the Appellate Court declined to address the *merits* of the defendant's unpreserved claims of prosecutorial misconduct. See *State* v. *Ancona*, supra, 36 n.10. The Appellate Court did state, however, that it would consider the defendant's unpreserved claims of prosecutorial impropriety "in determining whether the actions challenged in the defendant's preserved claims were prejudicial in light of the whole trial."[17] Id., 36 n.11.

The Appellate Court then reviewed the two claims of prosecutorial impropriety that the defendant had preserved by way of timely objection at trial. With respect to the defendant's first preserved claim, the Appellate Court concluded that the state's attorney "[had] failed to confine himself to the evidence in the record. During the [state's attorney's] rebuttal argument, he improperly displayed a badge that was not evidence in the case. He improperly made statements as to facts that had not been proven when he referred to a monument with the names of fourteen [thousand] to fifteen thousand police officers who died to 'protect us and they died to honor this, their badge. What those officers did that night is a disgrace.' Furthermore, the [state's attorney] improperly asserted his personal opinion that what the police officers did was a disgrace. The use of the badge and reference to the monument were not subjects of proper closing argument." Id., 38.

With respect to the defendant's second preserved claim of prosecutorial misconduct, the Appellate Court

[17] Thus, the Appellate Court further noted that, under the circumstances, *Golding* review of the claims raised by the defendant for the first time in his reply brief was "unnecessary . . . ." *State* v. *Ancona*, supra, 69 Conn. App. 36 n.10.

concluded that the state's attorney "improperly [had] appealed to the emotions, passions and prejudices of the jurors, thereby attempting to divert their attention from deciding the case on the evidence against the defendant. The defendant was the only police officer on trial. The [state's attorney's] closing and rebuttal arguments, however, were not limited to comments about the defendant's actions. The [state's attorney's] arguments continually referred to, and focused on, other police officers involved in the incident and law enforcement in general. . . . The [state's attorney's] rebuttal statement regarding a monument and fourteen thousand or fifteen thousand officers who 'died to protect us' and to honor their badge was a blatant attempt to divert the jurors' attention and appeal to their emotions, passions and prejudices by challenging the jurors not to 'let *them* get away with it.' . . . The [state's attorney] further attempted to distract the jury by using melodramatic language, by referring to a historical monument and by giving a hypothetical that had no basis in the evidence of the case. The [state's attorney] was attempting to color the jurors' minds with such emotion that they would consider it their duty to convict the defendant, regardless of the evidence. These comments could well have served to undermine the neutrality of the jury by distracting the jury's attention to either irrelevant factors or to matters of emotion and thereby divert the jury's attention from the issues in the case." (Citation omitted; emphasis in original.) Id., 39–40.

The Appellate Court next considered whether the statements of the state's attorney were so prejudicial as to require a new trial. The Appellate Court concluded: "Viewing the trial as a whole, including the [state's attorney's] remarks that were the subject of the defendant's unpreserved claims . . . the [state's attorney's] . . . arguments were so egregious that the defendant was deprived of a fair trial. First, the record in this case

discloses numerous instances of misconduct . . . that were in no way invited by the conduct or argument of the defense. Next, the improper conduct was severe and frequent as demonstrated by the fact that the [state's attorney] displayed extraneous items, including the blue tinted sunglasses and a badge, and introduced the concept of the 'blue code' [of silence] in his [closing and rebuttal] arguments. The [state's attorney] continued on this improper course by offering his opinion that the seasoned officers' testimony was unbelievable, that the rookie officers' testimony was believable and that the seasoned officers were responsible for failing to help [Wilson]. [The state's attorney] also posed hypotheticals involving extraneous facts and suggestions to the jurors to encourage them to relate to [Wilson]. Furthermore, the improper comments directly addressed the critical issue in this case, [namely] the credibility of the witnesses. The state's case relied primarily on the credibility of the witnesses. Moreover, the trial court failed to provide any additional curative measures beyond the general instruction regarding the fact that closing arguments are not evidence. Accordingly . . . the egregious prosecutorial misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id., 40–41. In light of this conclusion, the Appellate Court reversed the trial court's judgment and remanded the case for a new trial.

## II

### THE STATE'S APPEAL TO THIS COURT

On appeal to this court, the state contends, contrary to the determination of the Appellate Court, that the state's attorney's comments during final arguments were not improper. The state further claims that, even if some of those comments were improper, they were not so egregious or prejudicial as to warrant a new trial. Although we conclude that some of the state's

attorney's remarks were improper, we conclude that they did not violate the defendant's right to a fair trial.

The following additional evidence that was adduced at trial is necessary to our analysis of the various issues raised by the state's appeal. At approximately 9 p.m. on February 14, 1997, Officers Frederick Jainchill and Mark Selander of the Hartford police department were conducting a surveillance of suspected drug activity in the north end of Hartford. While sitting in their unmarked police cruiser, the two officers observed a pickup truck pull up to the curb next to a group of men who Jainchill and Selander had reason to believe were selling drugs. The group alerted the driver of the pickup truck, a white male, that the police were in the immediate vicinity. Instead of leaving the area, however, the driver proceeded down the street about 100 feet and, with the engine still running, stopped his vehicle and turned off the lights.

Jainchill and Selander decided to approach the pickup truck. They drove up directly behind the truck with their strobe lights flashing. Selander, who was in uniform, exited his vehicle and walked toward the truck. As Selander was approaching the truck, however, the driver of the truck drove away at a high rate of speed. Selander returned to his vehicle, and he and Jainchill pursued the truck. After the truck sped through an intersection without stopping, however, the officers terminated their pursuit and notified the dispatcher.

Shortly thereafter, Officer O'Callaghan spotted the truck and pursued it. The defendant and his partner, Officer Middleton, joined in the pursuit. As the pickup truck entered Bloomfield, members of the Bloomfield police department, including Officers Michaud, Freder-

icks, Driscoll, Mark Manson, Mark Samsel and John Lazarus,[18] also began to pursue the truck.[19]

The chase ended when Wilson pulled his vehicle onto the curb directly across the street from the Bloomfield police department. Driscoll and Michaud were the first officers to arrive, and the other officers from the Hartford and Bloomfield police departments arrived shortly thereafter. As those other officers were arriving, Driscoll exited his vehicle and ran to the cab of the pickup truck. Wilson opened the driver's side door of the cab, and Driscoll pulled him out, forcing him toward the back of the truck. Wilson did not resist Driscoll's use of force when Driscoll removed him from the truck.

As Driscoll was placing Wilson on the ground to handcuff him, the defendant ran over to Wilson with his gun drawn. Middleton also ran over to Wilson and struck Wilson twice in the back with the butt of her service revolver. Michaud then approached Middleton to assist in the arrest. However, Driscoll, who was supervising Michaud, a police trainee, grabbed Michaud by the back of her jacket and pulled her away. Wilson subsequently was handcuffed. O'Callaghan thereafter placed Wilson in one of the Hartford police cruisers.

A video camera affixed to the dashboard of Lazarus' cruiser captured Driscoll removing Wilson from his pickup truck and the defendant running toward the truck. The videotape also depicted the defendant raising his handgun in the air and then bringing it down swiftly in the area where Wilson, who was on his hands and

---

[18] Officers Driscoll and Michaud rode together in one cruiser, and Officers Manson and Fredericks rode together in another cruiser.

[19] The Bloomfield officers had been informed that the Hartford police suspected that the driver of the pickup truck was Mark Zukowski, a convicted felon for whom there was an outstanding warrant. Zukowski, moreover, had been the subject of prior police chases and, during one such chase, allegedly had attempted to run down a Hartford police officer. In fact, Wilson, not Zukowski, was the driver of the truck.

knees, was located. It cannot be discerned from the videotape, however, where the defendant's gun made contact with Wilson's body.[20]

Wilson was transported by ambulance to Saint Francis Hospital and Medical Center in Hartford for treatment of the injuries that he had sustained after being apprehended.[21] Wilson sustained a serious laceration over his right eye and other lacerations to his head and scalp, abrasions and cuts on his right hand, bruises on his left thigh and left shoulder, and significant swelling around his right eye. During the ambulance ride to the hospital, Wilson was complaining that the police had beaten him. The Hartford police issued Wilson a summons for one or more motor vehicle infractions, but he was not charged with committing a crime.

The defendant filed a report following the incident. According to the report, the defendant pulled up directly behind the pickup truck when it came to a stop. The report continued: "As this officer[22] was exiting his cruiser this officer observed Officer O'Callaghan [s]truggling with [Wilson], as this [officer] was approaching Officer O'Callaghan and Bloomfield [o]fficers [who] were on scene this officer [o]bserved [Wilson] with a closed fist swing around and punch Officer O'Callaghan in the chest. At this time Officer O'Callaghan was still attempting to control [Wilson] who now was pulling away from Officer O'Callaghan, when [Wilson] hit his forehead into the steel side rail of the [pickup] truck, on the driver's side. This officer now had finally reached Officer O'Callaghan and [Wilson] who was now swinging his arms violently at the officers with closed fists. As [Wilson] attempted to turn toward

---

[20] Consistent with Bloomfield police department procedure, Lazarus turned off the video camera upon exiting his cruiser.

[21] Driscoll accompanied Wilson to the hospital.

[22] The defendant apparently was referring to himself when stating "this officer."

the officers [Wilson] punched this officer with a closed fist, hitting this officer twice, once to the left shoulder, and then [to] the chest area. These officers [namely, the undersigned], O'Callaghan and Middleton, then pushed [Wilson] to the ground, at the road side which was/is covered with rocks, sand, [d]irt, [s]tones and [o]ther [d]ebris. As [Wilson] was on the ground facedown, and was still swinging his arms with closed fists while kicking his feet toward the officers . . . [t]he officers continued to attempt to control [Wilson] with arm locks and baton strikes to his legs and arms. This officer was finally able to place his baton under [Wilson's] left arm, securing [the] same so [that Wilson] could be handcuffed by Officer Middleton. [Wilson] was then placed and secured in a police cruiser." The defendant checked a box on his report to indicate that a copy should be forwarded to the office of the state's attorney.

O'Callaghan filed a report that corroborated the defendant's account of the incident in significant respects. O'Callaghan, who had been pursuing the pickup truck, observed Wilson pull the truck onto the curb and stop. O'Callaghan then exited his cruiser and ran toward the driver's side of the truck. According to O'Callaghan's report, "the driver's door opened suddenly and . . . Wilson began to step from the vehicle." O'Callaghan "ordered [Wilson] to stay in the vehicle" but Wilson, in defiance of the command, "stepped from the vehicle in A BOXER STANCE and began to charge the officers." O'Callaghan then "ordered [Wilson] to place his hands above his head but [Wilson] refused and . . . continued to lunge" toward O'Callaghan, who "attempted to grab hold of [Wilson's] [r]ight [a]rm . . . ." According to O'Callaghan, Wilson then "pulled his arm back and struck [O'Callaghan] in the chest." Because O'Callaghan "feared further injury" to himself and other officers, he "attempted to strike . . . Wilson on the [r]ight shoulder with [his] [d]epartment issued

baton." Wilson, however, "ducked down," and O'Callaghan "struck [him] in the head . . . [as Wilson] continued to swing his [a]rms at the officers. . . . [A] violent struggle then took place . . . [between Wilson] [a]nd [other officers]. . . . During the struggle [Wilson] [a]nd [other] officers were pushed into the side of [Wilson's] vehicle and then [d]own to the ground. . . . [Wilson] continued to flail his arms around nearly striking [O'Callaghan] again and . . . several officers had to hold [Wilson] [d]own until he was placed in handcuffs." O'Callaghan's report further indicated that he intended to seek a warrant for Wilson's arrest in connection with Wilson's alleged assault of and interference with the police officers.

Officer Middleton, who was riding in a cruiser with the defendant on the evening of the incident, also filed a report concerning Wilson's apprehension and arrest. Middleton stated in her report that Wilson had charged toward O'Callaghan and then "began to fight him." According to Middleton, she and the defendant intervened because they "were not sure if Officer O'Callaghan was injured." Middleton further stated in her report that, during the ensuing struggle, Wilson and several officers slammed into the truck before hitting the ground.

Shortly after Wilson was taken into custody, both the Hartford and Bloomfield police departments began to investigate the incident. Thereafter, the defendant was charged, in separate informations, with assault in the second degree with a firearm, assault in the second degree, fabricating physical evidence, conspiracy to fabricate physical evidence and falsely reporting an incident.[23] At trial, the state contended that the defendant

---

[23] Officers Middleton and O'Callaghan also were charged with various offenses in connection with their actions during Wilson's arrest and their submission of reports following the incident. Middleton was acquitted of all charges. O'Callaghan pleaded guilty, under a plea agreement, to falsely reporting an incident, conspiring to falsely report an incident and filing a false statement.

and other officers had used excessive and unnecessary force during Wilson's arrest and, further, that the defendant and other officers had attempted to cover up their assault by submitting false incident reports.

At trial, a number of police officers testified as witnesses for the state. Officer Lazarus testified that when he arrived at the scene, he noticed Wilson struggling with several Hartford police officers behind Wilson's truck. Although Lazarus believed that Wilson was resisting arrest, he had glanced only "very briefly" at the altercation before proceeding to check the interior of Wilson's pickup truck. By the time Lazarus returned to the rear of the truck, Hartford officers had handcuffed Wilson and the altercation was over.

Officer Driscoll testified that, contrary to the reports that the defendant, O'Callaghan and Middleton had filed, he was the first officer to reach Wilson after Wilson's truck had come to a stop. According to Driscoll, Wilson initially did not resist arrest, and Driscoll was surprised when one or more Hartford police officers pulled Wilson away from him. Driscoll believed that those officers pulled Wilson away from him because they "wanted to beat [Wilson] up or to hit him." Driscoll thereafter observed the officers "beating" Wilson. After viewing the videotape that had been taken with the camera on the dashboard of Lazarus' cruiser, Driscoll further testified that he believed that the defendant had taken Wilson from him and had struck Wilson.

Officer Michaud, who was a Bloomfield police officer trainee at the time of the incident, testified that when she arrived at the scene, she exited her cruiser and ran to the passenger side of Wilson's truck. Michaud checked the interior of the cab for other occupants and for weapons. She then turned around to see what had happened to Wilson and observed him on the ground with several officers on top of him. She further observed

a uniformed arm strike Wilson in the back with a black object. Michaud simultaneously heard another female officer, subsequently identified as Middleton, say, " 'don't you ever,' " in a "very angry voice . . . ." According to Michaud, she started to approach Wilson and the officers who were with Wilson, but Driscoll pulled her back.[24]

Officer Manson testified that he and his supervisor were the last officers to arrive at the scene. When he arrived, he saw Wilson on the ground, facedown. According to Manson, it appeared as though Wilson was not cooperating with the officers who were attempting to handcuff him. Manson witnessed several blows to Wilson's thigh and back area and told his supervisor that he remembered thinking that the Hartford officers "fucked [Wilson] up." Manson stated, however, that he could not identify the police officers who had struck Wilson.

Officer Fredericks, who also was a Bloomfield police officer trainee at the time of the incident, testified that, upon arriving at the scene, he saw something going on behind the truck, but stopped to inspect the interior of the cab before proceeding to the rear of the truck. When Fredericks did reach the rear of the truck, he observed Wilson lying facedown on the ground with two officers by his feet and a third officer on his back. Fredericks testified that he saw the officer on Wilson's back strike Wilson in the head with his weapon. Fredericks testified that he said, " 'Hey, what are [you] doing?' " Fredericks identified the defendant from a photographic array as the officer whom he had seen strike Wilson in the head with a revolver.

O'Callaghan testified that, contrary to the statement in his written report and contrary to the reports that

---

[24] Driscoll testified that he had pulled Michaud back because he "didn't want her there."

the defendant and Middleton had filed, he was not the first officer to confront Wilson at the scene. Rather, he arrived after Wilson already was out of the truck and on the ground.[25] O'Callaghan testified that when he arrived, Wilson had his hands beneath him, and that Middleton and the defendant were attempting, unsuccessfully, to grab Wilson's arms so that they could handcuff him. O'Callaghan testified that he asked Wilson to release his arms and, when Wilson failed to comply, O'Callaghan hit him on the shoulder with his baton.

O'Callaghan further testified that the defendant had told him shortly after the incident that he previously had been "involved with internal affairs,[26] and that he had been in a couple of situations and he didn't want to be involved with this one." According to O'Callaghan, the defendant asked him to write a report that would "justify" Wilson's injuries. The defendant then told O'Callaghan that Wilson "came out of the [truck] fighting . . . [and] throwing punches," that the defendant and the other officers "weren't able to control [Wilson]," and that they therefore "had to put him down onto the ground where he continued to struggle and fight." O'Callaghan agreed to state in his report that, after Wilson had pulled his truck over onto the curb, he was the first officer to arrive and, further, that Wilson had attacked him in the manner described by the defendant in his report. O'Callaghan also stated in his report that he had attempted to subdue Wilson by striking him on the right shoulder with his baton, but that Wilson had ducked and, as a result, O'Callaghan struck Wilson in the head. Finally, O'Callaghan testified that, before Middleton had drafted her report, he told her what he was planning to write in his own report.

[25] O'Callaghan testified in accordance with the terms of a plea agreement that he had entered into with the state. See footnote 23 of this opinion.

[26] The internal affairs division is responsible for investigating complaints concerning the misconduct of employees of the police department.

Several witnesses testified for the defense, including Samsel. Samsel testified that he was riding with Fredericks, whom Samsel was supervising, on the evening of the incident. According to Samsel, when he and Fredericks arrived at the scene, Wilson was on the ground struggling with several officers. Samsel saw a uniformed arm strike Wilson with a shiny object in the area of Wilson's left arm. Samsel also observed other officers strike Wilson. According to Samsel, however, he was unable to identify any of the officers who had struck Wilson.

The defendant testified in his own defense. According to the defendant, he believed that everything in his report was true when he wrote it. He further testified that he had not conspired either with O'Callaghan or Middleton to submit a false report or reports. The defendant did acknowledge, however, that, although he had indicated in his report that he personally had witnessed the events described therein, he actually had received some of the information contained in his report from O'Callaghan. In particular, the defendant acknowledged that, contrary to his report, he did not observe O'Callaghan pull Wilson from the cab of the pickup truck and did not observe Wilson strike O'Callaghan in the chest. The defendant testified that he had included that information in his report because O'Callaghan had told the defendant that that was what had happened. The defendant further testified that, although he had stated in his report that Wilson had struck him twice, Wilson actually was facedown on the ground at that time and "[i]t may have been other officers" who had struck the defendant. The defendant also acknowledged that he struck Wilson at least once, perhaps, twice, with his gun, and that it was possible that he also struck Wilson with his baton, but that he had failed to include this information in his report.

III

## SCOPE AND STANDARD OF REVIEW

Before turning to the merits of the state's claim that the Appellate Court improperly concluded that the defendant is entitled to a new trial, we set forth the scope and standard of our review. With respect to the former, the Appellate Court, as we have explained, declined to "review individually"; id., 36; certain instances of allegedly improper conduct by the state's attorney because the defendant had failed to object to the alleged improprieties at trial and to raise a claim under *Golding* on appeal. See id., 36 and nn. 10–11. The Appellate Court nevertheless considered the defendant's unpreserved claims of misconduct in the context of "determining whether the actions challenged in the defendant's preserved claims were prejudicial in light of the whole trial." Id., 36 n.11. The state contends that the Appellate Court improperly considered the alleged improprieties to which the defendant did not object at trial and that were not designated for *Golding* review on appeal. This issue is controlled by our recent decision in *State* v. *Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004), which was released after the Appellate Court had issued its opinion in this case.

In *Stevenson*, we clarified our due process analysis in cases involving incidents of prosecutorial misconduct to which no objection has been raised at trial. We explained that, in such cases, "it is unnecessary for the defendant to seek to prevail under the specific requirements of . . . *Golding* . . . and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by

this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). As we stated in that case: 'In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case.' . . . Id.

"Regardless of whether the defendant has objected to an incident of misconduct, a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial. The application of the *Williams* factors, therefore, is identical to the third and fourth prongs of *Golding*, namely, whether the constitutional violation exists, and whether it was harmful. *State* v. *Golding*, supra, 213 Conn. 240. Requiring the application of both *Williams* and *Golding*, therefore, would lead . . . to confusion and duplication of effort. Furthermore, the application of the *Golding* test to unchallenged incidents of misconduct tends to encourage analysis of each incident in isolation from one another. Because the inquiry must involve the entire trial, all incidents of misconduct must be viewed in relation to one another and within the context of the entire trial. The object of inquiry before a reviewing court in [due process] claims involving prosecutorial misconduct, therefore, is always and only the fairness of the entire trial, and not the specific incidents of misconduct themselves. Application of the *Williams* factors provides for such an analysis, and the specific

*Golding* test, therefore, is superfluous. In light of these observations, we conclude that, following a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the *Williams* factors to the entire trial.

"This does not mean, however, that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors. To the contrary, the determination of 'whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial. . . . [Thus], the fact that defense counsel did not object to one or more incidents of misconduct must be considered in determining whether and to what extent the misconduct contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." (Citations omitted.) *State* v. *Stevenson,* supra, 269 Conn. 572–76.

In accordance with *Stevenson,* therefore, we review the defendant's unpreserved claims of prosecutorial misconduct along with the incidents of alleged misconduct to which the defendant did object at trial. Because the state has fully briefed all of the defendant's claims of prosecutorial misconduct, including those involving incidents to which the defendant did not object at trial, the state is not prejudiced in any way by our review, in accordance with *Stevenson,* of the defendant's unpreserved claims of prosecutorial misconduct.

We now address the standards that guide our review of claims of prosecutorial misconduct during closing arguments. "[P]rosecutorial misconduct of a constitu-

tional magnitude can occur in the course of closing arguments. . . . In determining whether such misconduct has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . This heightened duty derives from our long recognition of the special role played by the state's attorney in a criminal trial. He is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of

counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . .

"Or to put it another way while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. . . . A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows. . . . In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions . . . and those which are flagrant and therefore deny the accused a fair trial. . . . Thus, prosecutorial misconduct occurring in final argument may be so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact." (Citations omitted; internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 246–48, 833 A.2d 363 (2003).

"[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Coney*, 266 Conn. 787, 808, 835 A.2d 977 (2003). As we have indicated, our determination of whether

any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540, with due consideration of whether that misconduct was objected to at trial. See *State* v. *Stevenson*, supra, 269 Conn. 576.

## IV

## THE ALLEGED PROSECUTORIAL IMPROPRIETIES

We now address those portions of the state's attorney final argument that the defendant contends were improper. The defendant's claims of prosecutorial misconduct fall into two general categories: (1) the improper introduction of matters outside the record for the purpose of distracting the jurors and appealing to their emotions; and (2) the improper expression of personal opinion. We consider each of these two categories of claims in turn.

### A

### Introduction of Matters Not in Evidence

The defendant claims that the state's attorney improperly referred to certain facts and used certain props that were not part of the record of the case. Specifically, the defendant claims that the state's attorney improperly: (1) displayed a pair of blue tinted sunglasses that were not in evidence; (2) introduced the concept of a "blue code" of silence; (3) displayed a badge that was not in evidence; (4) referred to a monument in Washington honoring fallen police officers that bore no legitimate relation to the case; and (5) posed hypothetical facts to the jury. The defendant further contends that these improprieties were designed to distract the jurors from the real issues in the case and to appeal to their emotions.

1

### The Use of Blue Tinted Sunglasses and the Reference to a "Blue Code" of Silence

We first address the defendant's claim regarding the state's attorney's use of the blue tinted sunglasses and his related reference to a "blue code" of silence. As we noted previously in this opinion, the state's attorney held up a pair of blue tinted sunglasses during his initial closing argument to symbolize what he believed to be the unwillingness of some of the police officers to report and to testify truthfully about what they had witnessed because to do so would criminally implicate the defendant, a fellow officer. In particular, the state's attorney asserted that those officers had viewed the defendant's misconduct "through blue tinted [sun]glasses. A police officer has a code. Don't ask me why, but there's a code: avoid ratting on a brother officer. And some of them did that that night, either consciously or unconsciously. They didn't want to see what was going on behind the truck." The state's attorney also argued that only the rookie officers had testified truthfully about what they had observed because those officers, in contrast to the veteran officers, were not yet "steeped in this blue code . . . ."

The state contends that the state's attorney's conduct was not improper. In support of its assertion, the state maintains that the state's attorney never suggested or implied that the blue tinted sunglasses actually were a part of the record and, moreover, the state's attorney's reference to the "blue code" of silence was tied to the evidence adduced at trial.

With respect to the defendant's claim regarding the blue tinted sunglasses, we are not persuaded that the state's attorney's use of those sunglasses, standing alone, necessarily was improper. Of course, counsel must refrain from injecting into closing argument extra-

neous matters unsupported by the record, and counsel's use, during closing argument, of props that are not in evidence creates a risk of diverting the jury's attention to facts or issues not properly before it. Nevertheless, counsel is entitled to considerable leeway in deciding how best to highlight or to underscore the facts, and the reasonable inferences to be drawn therefrom, for which there *is* adequate support in the record. We therefore never have categorically barred counsel's use of such rhetorical devices, be they linguistic or in the form of visual aids, as long as there is no reasonable likelihood that the particular device employed will confuse the jury or otherwise prejudice the opposing party. Indeed, to our knowledge, no court has erected a per se bar to the use of visual aids by counsel during closing arguments. On the contrary, the use of such aids is a matter entrusted to the sound discretion of the trial court. See, e.g., *Laney* v. *State*, 271 Ga. 194, 197–98, 515 S.E.2d 610 (1999) (trial court properly allowed prosecutor to use bag of sugar, which was not introduced into evidence, to demonstrate relatively small amount of force necessary to pull trigger of murder weapon); *People* v. *Dowds*, 253 Ill. App. 3d 955, 956–58, 625 N.E.2d 878 (1993) (in drunk driving case, trial court properly allowed prosecutor to use beer mug and large pitcher, which were not admitted into evidence, to demonstrate, consistent with evidence adduced at trial, amount of beer that defendant allegedly had consumed); *Commonwealth* v. *Nol*, 39 Mass. App. 901, 901–902, 652 N.E.2d 898 (1995) (in robbery case, trial court properly allowed prosecutor to use his own handkerchief as mask during closing argument for purpose of rebutting defense counsel's contention that identification of defendant as masked perpetrator was necessarily unreliable); *Commonwealth* v. *Twilley*, 417 Pa. Super. 511, 518–19, 612 A.2d 1056 (1992) (trial court reasonably permitted prosecutor to display baseball bat and beer

bottle during closing arguments, even though those two items had not been introduced into evidence, because evidence regarding manner in which alleged assault occurred demonstrated that defendant had used either baseball bat or beer bottle). Because there is nothing inherently prejudicial or unduly distracting about a pair of blue tinted sunglasses, and because the state's attorney did not purport to use those sunglasses for the purpose of filling an evidentiary gap in the state's case, we do not believe that the use of the sunglasses, without more, necessarily was improper, even though they had not been introduced into evidence.[27]

We do not consider the propriety of the state's attorney's display of the blue tinted sunglasses in a vacuum, however. Rather, his use of the sunglasses was inextricably linked to his argument regarding the purported "blue code" of silence. For the reasons that follow, we conclude that the comments of the state's attorney about the "blue code" of silence were improper. Inasmuch as the state's attorney's use of the blue tinted sunglasses served to highlight that improper argument, the use of the sunglasses in that context also was improper.

Turning to the comments regarding the "blue code" of silence, we note that the state did not adduce any

---

[27] Thus, by way of similar example, it would not necessarily be improper for counsel to display a pair of red tinted glasses to highlight an argument that a witness had viewed a certain fact or facts through rose colored lenses. Nor would it necessarily be improper for counsel to use his or her reading glasses during closing arguments to underscore the point that a particular witness' view of the facts was myopic. Of course, we do not encourage the use of such theatrics during closing arguments, and we do not suggest that the trial court would be required to countenance the repeated or unwarranted use of theatrics of that sort. See, e.g., *Weisbart* v. *Flohr*, 260 Cal. App. 2d 281, 293, 67 Cal. Rptr. 114 (1968) (counsel's repeated use of numerous props during closing arguments constituted improper "diversionary exercise" that created circus-like atmosphere in courtroom). We simply conclude that the use of such theatrical flourish, depending upon the circumstances, is not necessarily improper.

evidence at trial that such a "code" existed among police officers. Consequently, the state's attorney's assertion concerning the existence of such a code, as well as his contention that some of the police officers who had witnessed the defendant's alleged assault of Wilson had acted in conformity with that code, amounted to improper unsworn testimony. "Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 400, 832 A.2d 14 (2003). "[W]hen a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Internal quotation marks omitted.) Id. The state's attorney's reference to the "blue code" of silence, therefore, gave rise to an unacceptable risk that the jury would assume that the state's attorney had personal knowledge that such a code existed and, further, that the conduct and testimony of certain of the officers who were present at the scene were the product of that code. Moreover, as we have explained, the state's attorney's display of the blue tinted sunglasses served both to dramatize and to highlight the state's attorney's improper comments.

The state contends that the comments about a "blue code" of silence were not improper because those comments were based on reasonable inferences drawn from the evidence. Specifically, the state maintains that it would have been reasonable for the jury to infer that several of the officers who arrived at the scene deliberately went to the front of Wilson's truck in a calculated effort to avoid seeing the beating that allegedly was taking place at the rear of the truck. We agree with the state that the evidence supported such an inference and, in fact, the state's attorney made that very argument in

rebuttal.[28] In asserting the existence of a "blue code" of silence, however, the state's attorney did more than argue reasonable inferences from the facts: he explained the veteran officers' conduct in terms of a purported sociological phenomenon for which there was no evidentiary support. In light of that argument, there is a likelihood that the jury gave greater weight to the state's attorney's explanation than was warranted by the evidence.

## 2

### The Reference to a Monument in Washington and the Display of a Badge

The defendant next challenges the propriety of the following rebuttal argument by the state's attorney: "There's a monument in Washington that's set up that has about [14,000] or 15,000 plaques on it of officers who died in the line of duty. They died to protect us and they died to honor this: their badge. [The state's attorney apparently held up a badge at this point.] What those officers did that night is a disgrace. It's a disgrace to their badge. Don't let them get away with it." The defendant contends that the state's attorney's reference to the monument in Washington and his use of the badge, neither of which was based in the evidence, was outside the record. The defendant also contends that the state's attorney improperly appealed to the jurors' emotions in referring to the monument and using the badge.

---

[28] In his rebuttal argument, the state's attorney gave the following explanation as to why several of the veteran police officers at the scene had testified—in the state's view, untruthfully—that they had not witnessed any improper conduct by the defendant or any other officer: "None of the [veteran] officers had the—I say 'guts,' the wherewithal to get into this and stop the assault [of Wilson]. They didn't want to see it. It is a brother police officer. They don't want to know. It's sort of like seeing your brother or sister doing something wrong. You really don't want to have to deal with that. And, unfortunately, that's what came across in their testimony."

"It is well established that a prosecutor, in fulfilling his duties, must confine himself to the evidence in the record." (Internal quotation marks omitted.) Id. Furthermore, "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . We have stated that such appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . No trial—civil or criminal—should be decided upon the basis of the jurors' emotions." (Citations omitted; internal quotation marks omitted.) *State* v. *Rizzo*, supra, 266 Conn. 255.

We agree with the defendant that the state's attorney's reference to the monument in Washington honoring thousands of deceased police officers exceeded the bounds of permissible closing argument. The state's attorney improperly appealed to the passions of the jury and injected an extraneous matter into the trial. The monument bore no arguable relation to any issue in the case, and the state's attorney's invocation of the memory of slain police officers created a risk of diverting the jury's attention away from the issues before it. In light of the fact that the case involved alleged misconduct by a police officer, the state's attorney's reference to the monument and to the deceased officers it memorializes improperly appealed to the jurors' emotions and likely distracted the jury from its duty of deciding the case objectively and dispassionately.

We next address the state's attorney's display of the badge. As we have explained; see part IV A 1 of this opinion; it is not per se impermissible to use visual aids during closing arguments. Rather, the propriety of such

conduct must be determined in light of the particular circumstances. Because it is common knowledge that police officers wear or carry badges, it is not necessarily improper for a prosecutor to display a badge symbolically, for the purpose of underscoring the fact that such officers are sworn to uphold the law. The state's attorney, however, did not display the badge with reference to the duties and responsibilities of the defendant or, for that matter, any other officer involved in this case. Rather, he displayed the badge to emphasize that the officers memorialized by the monument in Washington had died in the course of upholding the law. In view of the fact that the state's attorney's comments regarding the monument were improper, so, too, was his use of the badge in connection with those comments.

The defendant also claims, as the Appellate Court concluded; see State v. Ancona, supra, 69 Conn. App. 39–40; that the foregoing argument by the state's attorney, coupled with his admonition to the jury not to "let them get away with it," and his assertion that the conduct of the defendant and several other officers was "a disgrace to their badge," constituted an improper attempt by the state's attorney "to transform the trial from a case about assault and fabrication of evidence into an opportunity for the jurors, as the community's representatives, to send a message to all police officers." Id., 38–39. We agree that the argument was improper because, when considered as a whole, it reasonably might have been construed by the jury as suggesting that a verdict of not guilty would dishonor the memory of police officers who had lost their lives in the line of duty. To the extent that the state's attorney's argument may have conveyed that message, the argument was an inappropriate appeal to emotion.[29]

[29] We do not suggest, however, that the state's attorney's comment not to "let them get away with it," and his remark that the conduct of the defendant and other officers constituted a "disgrace" to their badges, necessarily would have been improper if those comments had not been linked to the monument in Washington. In the context of a case, like the present

### 3

### The Posing of Hypothetical Facts

The defendant also contends that the state's attorney improperly relied on facts not in evidence in posing a hypothetical to illustrate his point that the same officers who claimed not to have witnessed their fellow officers' alleged assault of Wilson undoubtedly would have seen the assault if it had been committed *by* Wilson against the police officers. See footnote 9 of this opinion. We are not persuaded that this argument was improper. The challenged comments carried no suggestion that the hypothetical facts were real. Moreover, the thrust of the argument merely was to highlight the state's position that several of the police officers at the scene actually had witnessed a good deal more than they were willing to acknowledge at trial because of their desire not to implicate a fellow officer. It therefore was proper argument for the state's attorney to assert that those officers would have seen the alleged assault had it been committed by a civilian and not another police officer or police officers.

### B

### Expressions of Personal Opinion

The defendant also claims that the state's attorney improperly expressed his personal opinion during closing arguments. Specifically, the defendant claims that

one, which involves an alleged cover-up, a prosecutor's admonition to the jury not to let the defendant or other alleged wrongdoers get away with their conduct merely serves to underscore the state's evidence of the alleged cover-up. With respect to the state's attorney's assertion that certain officers, including the defendant, had disgraced their badges, that argument, too, would not necessarily have been improper if it had not been linked to the monument in Washington because the evidence supported a finding that the conduct of those officers was such as to bring dishonor upon them. As a general matter, however, we discourage prosecutors from characterizing conduct as a "disgrace" or as "disgraceful" because that characterization possibly may be viewed as an appeal to the passions of the jurors.

the state's attorney improperly: (1) stated his view that some officers knew that Wilson was being assaulted and intentionally avoided witnessing that assault; (2) vouched for the credibility of the rookie officers; (3) expressed his opinion regarding the lack of credibility of certain veteran officers; (4) told the jury that he "blame[d]" those veteran officers for not stopping the alleged assault of Wilson; and (5) expressed his opinion that some of the police officers had disgraced their badges and perverted the law.[30] The state contends that the challenged remarks were proper comments on the evidence and the reasonable inferences to be drawn therefrom. We agree with the state that the remarks were not improper.

It is well settled that a "prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 266 Conn. 248.

1

## Opinion Regarding Officers' Avoidance of Witnessing the Alleged Assault

The defendant first argues that the state's attorney improperly stated his opinion that the officers who pro-

---

[30] The defendant also claims that the state's attorney improperly insinuated that he was privy to information, which was unavailable to the jury, that buttressed the state's case against the defendant. The defendant has failed to identify anything in the record to support his contention, however. We therefore decline to review this claim.

ceeded directly to the cab of Wilson's truck did so because they knew or suspected that Wilson was being assaulted at the rear of the truck by fellow officers and did not want to witness the assault.[31] We conclude that these remarks were not improper. At trial, Lazarus testified that, upon arriving at the scene, he noticed other officers at the rear of the truck struggling with Wilson. According to Lazarus, he did not stop to assist those officers or to determine the nature of the altercation but, rather, walked past the altercation and proceeded to inspect the interior of the cab of the truck. Fredericks similarly testified that, although he saw some activity at the rear of the truck, he checked the interior of the cab before determining what was happening behind the truck. "It is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 465, 832 A.2d 626 (2003). In light of the evidence regarding the manner in which several of the officers conducted themselves upon arriving at the scene, it was permissible for the state's attorney to argue that the jury could infer that those officers proceeded directly to the cab of the truck in order to avoid witnessing the alleged assault.

2

### Opinion Regarding the Credibility of the Rookie Police Officers

The defendant next contends that the state's attorney improperly vouched for the credibility of the rookie

---

[31] The state's attorney stated: "Now, if we had a passenger in that vehicle that night sitting beside Mr. Wilson, we would have no trouble prosecuting that person for anything that he or she may have done because I think every officer on the scene looked in the cab of the truck. In fact, there must have been a line of officers waiting to check out the cab. And why is that? Because they knew what was going on behind the truck. They knew and they didn't want to see it. That's why they came in and testified the way that they did."

police officers. During his closing argument, the state's attorney remarked: "[T]hey didn't see what [the defendant] and Officer Middleton did that night, except the two rookies, the two rookies who hadn't been steeped in this blue code yet. They both testified as to what they [had] observed." Although, as we previously have explained; see part IV A 1 of this opinion; the state's attorney improperly introduced the concept of a "blue code" of silence in his closing argument, the state's attorney otherwise did not improperly vouch for the credibility of the rookie officers. It is permissible for a prosecutor to explain that a witness either has or does not have a motive to lie. Id., 466. With the exception of the reference to the "blue code" of silence, we discern no impropriety in the state's attorney's remarks indicating that, in the state's view, some officers were motivated to avoid witnessing the alleged assault of Wilson and that other officers did not share that same motive.

3

Opinion Regarding the Lack of Credibility
of Certain Veteran Police Officers

The defendant also claims that the state's attorney improperly expressed his personal opinion regarding the lack of credibility of certain veteran police officers. In particular, the defendant challenges the following rebuttal argument by the state's attorney: "And I don't believe for a minute that all these officers were either true to themselves or spoke the whole truth. Perhaps they don't know what it is. Perhaps they're afraid to address it. But look at what they didn't say. There wasn't one officer [who] got on the stand and said, 'You know, I saw exactly what went on. This guy was struggling. What they did was proper.' They all turned away at one point or another. 'Well, yeah, I saw something going on but I don't know what it was. Yeah, he was struggling but I don't know what exactly he was doing.' " The

state's attorney also stated that, "[a] lot of the officers that were there that night weren't involved in the search for the truth. And when they testified here they weren't involved in the search for the truth." We reject the claim of the defendant insofar as he takes issue with the state's attorney's assertion that some of the witnesses were not entirely candid in their testimony. As we have explained, the state's case was predicated upon the theory that a number of police officers had engaged in a cover-up that commenced on the evening of the incident and continued up to and throughout the defendant's trial. Because there was sufficient circumstantial evidence to support such a claim, the state's attorney's argument urging the jury to credit that theory was not improper.

We nevertheless agree with the defendant that the state's attorney should not have expressed his own belief that those officers had testified untruthfully. Rather, he should have couched his argument in terms of the *state's* theory of the case. The state's attorney's comment regarding his belief that several officers had testified untruthfully, however, was isolated and not repeated. Moreover, the state's attorney's use of the first person did not carry the suggestion that he possessed information unavailable to the jury; on the contrary, the state's attorney recited the specific evidentiary predicate for the inference that he was urging the jury to make. "We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on [the] one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." Id., 465. Although "[w]e repeatedly have emphasized that counsel, and especially prosecutors, must be particularly careful to avoid the unnecessary use of the first person"; *State* v. *Reynolds*, 264 Conn. 1, 205, 836 A.2d 224 (2003), cert. denied, 541 U.S.

908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); we also have recognized that comments of the type at issue here "represent the kind of lapse that sometimes occurs, without premeditation, in the heat of the moment and at the close of an emotional trial." Id. "Thus, isolated comments of this type generally do not give rise to a due process violation or otherwise result in manifest injustice because a properly instructed jury is likely to appreciate fully its duty to decide the case on the evidence and not on the basis of such rhetoric." Id. In view of the fact that the state's attorney's use of the first person was limited, and because the jury was instructed that the arguments of counsel do not constitute evidence, we conclude that the state's attorney's isolated assertion of his belief that some of the officers had testified untruthfully did not rise to the level of misconduct.

4

### Blaming of Police Officers Who Did Not Stop the Alleged Assault

The defendant next claims that the state's attorney improperly expressed his personal opinion by stating, in his rebuttal argument, that he "blame[d]" the officers who were present at the scene for not stopping the alleged assault of Wilson.[32] Again, it would have been preferable if the state's attorney had avoided any comment indicating that he "blame[d]" the officers for failing to come to Wilson's aid. The comment was fleeting, however, and, when viewed in context, it is apparent

---

[32] The state's attorney stated in relevant part: "None of the other officers had the—I say 'guts,' the wherewithal to get into this and stop the assault. They didn't want to see it. It is a brother police officer. They don't want to know. It's sort of like seeing your brother or sister doing something wrong. You really don't want to have to deal with that. And, unfortunately, that's what came across in their testimony. Do I blame the four? Well, yeah, I do because they take an oath to uphold the law and they should have upheld the law that night and stop[ped] what was going on, and they didn't do it."

that the remark, albeit inappropriate, was merely an effort by the state's attorney to underscore the state's view that those officers, in the proper discharge of their duties, should have intervened on Wilson's behalf. Furthermore, the statement was made in response to the defense counsel's suggestion during his closing argument that the officers' failure to intervene supported the theory that the use of force against Wilson was justified. Under the circumstances, therefore, the state's attorney's improvident use of the first person to assess "blame" in no way jeopardized the defendant's right to a fair trial.

5

### Opinion that Certain Police Officers Disgraced Their Badges and Perverted the Law

Finally, the defendant claims that the state's attorney improperly expressed his personal opinion in stating that some of the police officers had "disgrace[d]" their badges[33] and "perverted the law."[34] We conclude that these remarks were not improper expressions of personal opinion.[35] The evidence adduced at trial and the reasonable inferences to be drawn therefrom supported the conclusion that one or more police officers had

---

[33] In the context of referring to the monument in Washington honoring police officers killed in the line of duty and holding up the badge, the state's attorney argued: "What those officers did that night is a disgrace. It's a disgrace to their badge. Don't let them get away with it."

[34] The state's attorney stated: "These are officers [who] are sworn to uphold the law. What did they do? They perverted—I submit to you if it had not been for that snippet of videotape, you, in fact, would be sitting on the trial of . . . Wilson and not [the defendant]. These officers perverted the law. They assaulted this man."

[35] As we noted previously, however; see part IV A 2 of this opinion; certain comments of the state's attorney, which included the remark that certain police officers had disgraced their badges, were improper to the extent that they conveyed to the jury that a verdict of not guilty would dishonor the memory of the police officers who were memorialized by the monument in Washington to which the state's attorney also referred during his rebuttal argument.

assaulted Wilson. The evidence further suggested that the defendant had filed a false report and had conspired with other officers to conceal evidence. Accordingly, the state's attorney's argument that certain officers, including the defendant, had disgraced their badges and perverted the law merely was rhetorical flourish based on the evidence adduced at trial and not improper expressions of personal opinion.[36]

V

DUE PROCESS ANALYSIS

We turn now to the issue of whether the identified improprieties, namely, the state's attorney's comments regarding the monument in Washington, his use of the badge to underscore that argument, and his improper introduction of the concept of a "blue code" of silence while using the blue tinted sunglasses, "so infected the trial with unfairness as to make the [defendant's] conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 477. In other words, we must decide "whether the sum total of [the state's attorney's] improprieties rendered the defendant's [trial] fundamentally unfair . . . . The question of whether the defendant has been prejudiced by prosecutorial misconduct . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the

---

[36] The defendant also contends that the state's attorney improperly encouraged the jury to find the defendant guilty because he had disgraced his badge. According to the defendant, that argument was improper because it suggested that the jury should hold the defendant, as a police officer, to a higher standard than a layperson. We disagree. The state's attorney's comments were based upon evidence tending to establish that the defendant and other officers had assaulted Wilson and then had falsified their reports to cover up the assault. Thus, the state's evidence, if credited, was sufficiently serious to warrant the conclusion that, in light of their sworn obligation to uphold the law, the defendant and the other officers indeed had brought disgrace upon themselves as law enforcement officers.

improprieties." (Internal quotation marks omitted.) *State* v. *Peeler*, 267 Conn. 611, 642, 841 A.2d 181 (2004).

As we have indicated, we evaluate the defendant's claim of a due process violation in light of several factors, including: (1) the extent to which the misconduct was invited by defense conduct or argument; (2) the frequency and severity of the misconduct; (3) the centrality of the misconduct to the critical issues in the case; (4) the strength of any curative measures taken; (5) the strength of the state's case; and (6) whether the defendant objected to the misconduct. E.g., *State* v. *Stevenson*, supra, 269 Conn. 573, 575–76; see also *State* v. *Williams*, supra, 204 Conn. 540. Applying these factors, we conclude, contrary to the determination of the Appellate Court, that the state's attorney's misconduct did not deprive the defendant of a fair trial.

The state acknowledges that the state's attorney's improper comments were not invited by defense counsel. The state contends, however, that the misconduct was neither frequent nor severe, that the misconduct was not central to the critical issues in the case, that the trial court's general instructions at the conclusion of the case were sufficient to counter any possible prejudice to the defendant, and that the state's case against the defendant on the charges of which he was convicted was strong.

With respect to the state's attorney's comments regarding the "blue code" of silence, those comments, although made in both closing and rebuttal arguments, were quite brief. The state's attorney's use of the blue tinted sunglasses to underscore that argument was similarly fleeting. Thus, the misconduct was isolated and sporadic rather than frequent and pervasive.

The same is true with respect to the state's attorney's reference to the monument in Washington and to his use of the badge to underscore that argument. Although

the reference to the monument and the use of the badge constituted an improper appeal to the jurors' emotions, the improprieties were very brief. The brevity of those improprieties, coupled with the fact that the trial lasted six days and involved testimony from more than twenty witnesses, suggests that the improprieties, when viewed in that broader context, were unlikely to have prejudiced the defendant or otherwise have influenced the jury.

We next address the severity of the misconduct. The most serious misconduct was the state's attorney's reference to the "blue code" of silence. By introducing that concept into his final arguments, the state's attorney suggested the existence of a sociological phenomenon, for which there was no support in the evidence, to explain why, in the state's view, the defendant and other officers all were untruthful about their involvement in the altercation with Wilson. Thus, the argument improperly buttressed the state's theory regarding the alleged cover-up, a theory that was central to the state's case. The state's attorney's argument regarding the "blue code" of silence, therefore, cannot be dismissed as harmless merely because it did not pervade the state's attorney's argument.

Whatever harm may have flowed from those remarks likely was not substantial, however. First, the state's attorney also explained that police officers generally are loathe to testify against brother or sister officers in much the same way that siblings generally are loathe to tell on one another. See footnote 28 of this opinion. That argument, the propriety of which has not been challenged, is predicated upon a commonsense understanding of the realities of police work and, consequently, constituted an alternative, albeit related, explanation for the alleged misconduct of the defendant and his fellow officers. That alternative argument likely served to reduce any prejudice that might have flowed

from the state's attorney's reference to the "blue code" of silence.

Furthermore, the defendant did not object to the state's attorney's argument regarding the "blue code" of silence or to his use of the blue tinted sunglasses to underscore that argument.[37] As we recently have emphasized, defense counsel's failure to object to the state's argument when it was made "suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Ceballos*, supra, 266 Conn. 414. In fact, defense counsel sought to capitalize on the state's attorney's remarks about the purported "blue code" of silence. Specifically, in closing argument, defense counsel stated that the state's attorney was "stuck" with that version of the facts. Defense counsel then proceeded to characterize the state's attorney's argument as follows: "[The state's attorney] put on all these officers and, no, they didn't support that they saw [the defendant] hit anyone; and, no, they didn't see the blow being administered to the head, but they are all looking through blue-colored glasses. So [the state's attorney is] now asking you to convict [the defendant] because, clearly, the officers, including all the Bloom-field police officers, are behind that thin, blue line and are not testifying. Why did [the state's attorney] put them on the stand? [Are] [y]ou going to convict [the defendant] with some kind of concept of conspiracy among all these officers? . . . [The state's attorney is] standing before you and saying there's a conspiracy of everyone, Hartford, Bloomfield, everyone, and that's why you know [the defendant] did it because these officers wouldn't say they saw him hit [Wilson] in the

---

[37] Thus, defense counsel never asked the court for a curative instruction regarding the state's attorney's comments about the "blue code" of silence. The defendant, therefore, "bears much of the responsibility for the fact that [the impropriety] went uncured." *State* v. *Ceballos*, supra, 266 Conn. 414.

head even if they had. They didn't see it because [the defendant] didn't hit [Wilson]."

Thus, defense counsel chose not to object to the state's attorney's comments about the "blue code" of silence or to his use of the blue tinted sunglasses but nevertheless urged the jury to conclude that the reference to the "blue code" and the use of the blue tinted sunglasses were indicative of the state's weak case against the defendant. "[O]rdinarily, when a defendant who raises an objection to the allegedly improper remarks of a prosecutor elects to pursue one remedy at trial instead of another, he will not be permitted to claim on appeal that the remedy he pursued was insufficient." *State* v. *Reynolds*, supra, 264 Conn. 165. Under the circumstances, therefore, the state's attorney's misguided references to the "blue code" of silence would have to be especially egregious to warrant a new trial.

With respect to the state's attorney's reference to the monument in Washington and to his use of the badge, we do not perceive either impropriety to have been particularly severe. Although we do not condone this misconduct, we are not persuaded that it was likely to have had a significant impact on the jury. The reference to the monument and the use of the badge were improper because they invoked, for no legitimate purpose, the memory of slain police officers.[38] The case against the defendant, however, involved only a simple assault and an ensuing cover-up; no police officer was killed or even harmed. Thus, in context, the emotional appeal of the state's attorney's argument was relatively limited.

We next consider the curative measures, if any, adopted by the trial court. As we have indicated; see

---

[38] As we have explained; see part IV A 2 of this opinion; the state's attorney's use of the badge was improper only because it served to underscore the state's attorney's remarks about the monument in Washington.

footnote 37 of this opinion; the defendant did not object to the state's attorney's argument regarding the "blue code" of silence and, consequently, the issue of a curative instruction regarding that argument never was raised. As we have indicated, however, defense counsel sought to use those remarks to his advantage by suggesting, in his closing argument, that the state's attorney's remarks evidenced a weakness in the state's case. With respect to the state's attorney's remarks about the monument and his use of the badge, defense counsel claimed at trial that the impropriety could not be cured by an instruction and, presumably, for that reason, he did not seek one.[39] The trial court did not give a curative instruction sua sponte in light of its conclusion that the argument "fell within fair comment."[40]

Although the trial court did not issue any specific curative instructions, the court did instruct the jury, both before the trial and again following closing arguments of counsel, that statements and arguments of counsel are not evidence. The court also instructed the jurors that they must not be influenced by any personal prejudices or opinions and that they must decide the case against the defendant solely on the facts before them. We repeatedly have stated that "[t]he jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Fields*, 265 Conn. 184, 207, 827 A.2d 690 (2003). In light of the brevity and isolated

[39] We note that, on appeal to the Appellate Court, the defendant claimed that defense counsel's objection, coupled with defense counsel's observation regarding the futility of a curative instruction, constituted a motion for a mistrial. See *State* v. *Ancona*, supra, 69 Conn. App. 36. The Appellate Court rejected the defendant's contention that "an objection stating that the [state's attorney's] statements were prejudicial and objectionable and [could not] be cured by an instruction constitutes a motion for a mistrial." (Internal quotation marks omitted.) Id.

[40] In accordance with that determination, the trial court also indicated that it was "not going to take any further action."

nature of the improprieties, the trial court's general instructions likely minimized any harm that may have resulted from the improprieties.

Finally, we consider the strength of the state's case against the defendant. The jury found the defendant guilty of fabricating physical evidence, conspiracy to fabricate physical evidence and falsely reporting an incident. The state thus had to prove that the defendant: (1) drafted his police report knowing that it was false and for the purpose of misleading a public servant engaged in an official proceeding; (2) entered into an agreement with others to make a false police report; and (3) gratuitously reported, to a law enforcement agency, information about an actual incident that he knew to be false. See generally General Statutes §§ 53a-155 (a) (2) and 53a-48 (a); General Statutes (Rev. to 1997) § 53a-180 (a) (3) (C). The state's case against the defendant on these charges was very strong, if not overwhelming. For example, in his report of the incident, the defendant stated that when he arrived at the scene, he personally witnessed Wilson struggling with O'Callaghan and that he also witnessed Wilson strike O'Callaghan in the chest. Testimony adduced at trial, however, established convincingly that O'Callaghan did not arrive on the scene until after Wilson was on the ground. Furthermore, the videotape of the incident shows that the first officer to engage with Wilson was not O'Callaghan but, rather, Driscoll, who testified that Wilson did not punch him and did not resist arrest. Indeed, the defendant himself testified that, although his report indicated that he personally had observed certain events, his report of those events, in fact, was not based on firsthand observation but, rather, on information he purportedly had received from other officers.

The defendant further stated in his report that Wilson punched him twice. At trial, however, the defendant admitted that the videotape did not reveal those

punches and that Wilson was on the ground, facedown, when the defendant claimed that Wilson had punched him. The defendant also admitted on cross-examination that he struck Wilson at least once with his gun but that he did not include that information in his report. Finally, the reports filed by O'Callaghan and Middleton contain several of the same false representations that the defendant's report contained. Specifically, all three officers reported that O'Callaghan was the first officer to reach Wilson. Furthermore, both O'Callaghan and the defendant reported that Wilson had struck O'Callaghan in the chest. O'Callaghan, the key witness for the state, indicated in his testimony that the defendant had asked him to falsify his report. Thus, the strength of the state's case militates against a conclusion that the state's attorney's isolated improprieties during closing arguments affected the fundamental fairness of the trial.

It is noteworthy, finally, that the jury found the defendant not guilty of the assault charges. Consequently, to the extent that the state's attorney's argument appealed to the emotions of the jurors, that appeal was not so powerful as to cause the jury to find the defendant guilty of the assault charges. On the contrary, the fact that the jury reviewed each charge separately and found the defendant guilty of some charges but not others strongly suggests that the jury discharged its responsibilities without regard to the improper comments of the state's attorney.

We conclude, therefore, that there is no reasonable likelihood that the state's attorney's misconduct compromised the defendant's right to a fair trial. Accordingly, we disagree with the conclusion of the Appellate Court that the defendant is entitled to a new trial.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.