******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* CASEY
LIEM SULLIVAN
(AC 45378)

Cradle, Clark and Palmer, Js.

*Syllabus*

Convicted of the crimes of unlawful restraint in the second degree, sexual assault in the fourth degree, attempt to commit sexual assault in the third degree and sexual assault in the third degree, the defendant appealed to this court. The defendant rented a basement apartment in his raised ranch home to K. One day, K texted the defendant to let him know that her daughter, C, would be staying in the apartment that night. C arrived that evening and stayed in K's apartment, where no one else was present. At one point that evening, before K arrived home, the defendant knocked on the basement door and invited C upstairs to meet his dogs. Approximately one-half hour later, after C had returned to the apartment, the defendant again came downstairs and invited C upstairs to show her some sculptures he had made. After C had viewed the sculptures, C climbed over a dog gate on the stairway to return to the basement. At that point, the defendant grabbed C under her arms and lifted her back over the gate, placing her on a couch in the living room and laying on top of her. He rubbed C's breasts and genitals over her clothing. When the defendant shifted his position, C was able to slide out from underneath him and off the couch, and she walked to the stairway with the dog gate. The defendant followed, and, using his leg to pin C against the gate, he undid his waistband, exposed his penis, and grabbed C's hand. As C attempted to climb over the dog gate, the defendant tugged at her shirt and bra, exposing her breasts, and proceeded to kiss and lick one of C's exposed breasts and neck. C was eventually able to get over the gate, after which she returned to K's apartment and locked the door behind her. On appeal, the defendant claimed, inter alia, that the prosecutor committed prosecutorial impropriety during rebuttal closing argument, specifically by her use of the phrase "nuts and sluts" in her statement that, "[i]n sex cases, it's generally nuts and sluts is what they call it. Either the victim has had other, you know, situations that you're not gonna believe that she wasn't consenting or she's nuts. And the question is do you think [C] is nuts? Because she'd have to be nuts to make all of this up." *Held*:

1. The defendant could not prevail on his claim that prosecutorial impropriety occurred as a result of certain of the prosecutor's statements during rebuttal closing argument:

a. A statement made by the prosecutor discussing four general defenses in criminal cases during argument was not improper and did not imply that the defendant had a duty to present a defense: the prosecutor's statement was a brief preface to the state's rebuttal argument that C did not have a motive to lie, and, in context, was used simply to rebut defense counsel's asserted defense that C was lying about the incident and that the alleged incident never occurred; moreover, at no point during the rebuttal argument did the state suggest that the defendant had a duty to present one of the four defenses or a defense at all, and, in fact, on multiple occasions during closing arguments, the prosecutor reminded the jury that, before it could find the defendant guilty, it must find that the evidence presented proved the defendant's guilt beyond a reasonable doubt.

b. This court concluded that, in this particular case, the prosecutor's use of the phrase "nuts and sluts" during rebuttal closing argument did not constitute prosecutorial impropriety: the prosecutor's statements, in context, invited the jury to assess C's credibility based on the relevant evidence, and were used to rebut the arguments that defense counsel had made during his summation in which he suggested that C was lying about the incident and that the alleged incident never occurred, and the statement at issue did not imply any burden of proof on the part of the defense; moreover, contrary to the defendant's claim, the statement, in context, was not highly inflammatory and did not appeal to the emotions

of the jurors, as the statement was not used as a personal attack on the defendant's character or as a plea for sympathy for C or her family; furthermore, even if this court were to conclude, for the sake of argument, that the use of the phrase "nuts and sluts" in the prosecutor's argument was improper, it did not deprive the defendant of a fair trial, as the remarks were not frequent or severe, defense counsel did not object to the remarks when they were spoken, request curative instructions, or move for a mistrial, and, although the credibility of C was a central issue in the case and the remarks had some bearing on credibility, the defendant's reliance on centrality in support of his due process argument was counterbalanced by the fact that the defense, at least in part, invited the remarks by calling into question the veracity of C's testimony by arguing that the alleged assault did not occur, and the state presented strong direct and circumstantial evidence against the defendant, including the presence of his DNA on C's neck and contemporaneous Facebook messages from C to K pleading for help, evidence sufficiently strong enough not to have been overshadowed by the alleged improper remarks.

2. The defendant could not prevail on his claim that his punishments stemming from his convictions of sexual assault in the third degree and sexual assault in the fourth degree violated his constitutional protection against double jeopardy: the offenses charged did not arise from the same act or transaction as the evidence showed that the conduct related to the charge of fourth degree sexual assault began on the living room couch and ended when C slid out from underneath the defendant, stood up, and proceeded to walk away, and a separate act, the basis of the third degree sexual assault charge, occurred when the defendant subsequently approached C at the top of the stairs leading to K's apartment and pulled down C's shirt and bra, exposing her breasts, and licked her breast and neck, and the state's theory of the case at trial buttressed the conclusion that the charges stemmed from these separate acts or transactions; moreover, contrary to the defendant's contentions, the fact that the state charged the defendant with multiple offenses that occurred at the same residence in a relatively short time span did not necessarily mean that his convictions arose from the same criminal act or transaction.

Argued April 6—officially released July 11, 2023

*Procedural History*

Substitute information charging the defendant with the crimes of unlawful restraint in the second degree, sexual assault in the fourth degree, attempt to commit sexual assault in the third degree, and sexual assault in the third degree, brought to the Superior Court in the judicial district of Windham, and tried to the jury before *Chaplin, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Trent A. LaLima*, with whom was *Virginia M. Gillette*, for the appellant (defendant).

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, was *Anne Mahoney*, state's attorney, for the appellee (state).

*Opinion*

CLARK, J. The defendant, Casey Liem Sullivan, appeals from the judgment of conviction, rendered following a jury trial, of unlawful restraint in the second degree in violation of General Statutes § 53a-96, sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (2), attempt to commit sexual assault in the third degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-72a (a) (1), and sexual assault in the third degree in violation of § 53a-72a (a) (1). On appeal, the defendant claims that (1) the prosecutor committed prosecutorial impropriety and deprived him of a fair trial when she made certain improper statements during closing arguments, and (2) his punishments stemming from his conviction of sexual assault in the third degree and sexual assault in the fourth degree violated his constitutional protection against double jeopardy. We disagree with both claims and, accordingly, affirm the judgment of the court.

The jury reasonably could have found the following facts. In January, 2017, K responded to a Craigslist ad for a basement apartment rental in the defendant's raised ranch home. K entered into a verbal agreement with the defendant for the apartment, which included a six month lease term, a $500 security deposit, and a monthly rent of $700. K had received a notice to quit from her former landlord for nonpayment of rent and liked that the terms of the lease agreement with the defendant were "loose" because she was in a "transitional period" in her life.

On March 29, 2017, K texted the defendant to let him know that her daughter, C, would be staying over that night.[1] C, who was then twenty years old, had recently gone through a difficult breakup with her boyfriend and needed a place to stay for the night as she prepared to move into a new apartment the following day.

On the evening of March 29, 2017, K went to band practice[2] at her bandmate M's house and left a key under the doormat so that C could enter the basement apartment after C finished her shift at work.[3] C arrived that evening and stayed in her mother's apartment, where no one else was present. Sometime before 10 p.m., the defendant came downstairs and knocked on the basement door. After C opened the door, the defendant asked her if she needed anything and if she wanted to come upstairs to meet his dogs. C agreed to come upstairs. She followed the defendant up the stairs and proceeded to pet the defendant's dogs. The defendant then asked C if she wanted the Wi-Fi password to access his Internet. C accepted the password, after which the defendant approached her and hugged her. C did not hug him back and kept her arms at her side because she felt uncomfortable and did not like to be touched by strangers.[4] She told the defendant that the interaction

"was weird," and she proceeded to jump over the dog gate that was at the top of the basement stairs and returned to her mother's apartment downstairs.[5]

Approximately one-half hour later, the defendant again came downstairs to K's apartment where C was. He brought with him his cell phone where he had C's Instagram account visible on the screen. The defendant proceeded to show C her own photos from her account, commenting on her looks and telling her that she looked attractive. His comments made her feel uncomfortable, especially in light of the prior interaction that she had with the defendant that evening. But, to be polite, she thanked him. During this conversation, the defendant told her that he had an interest in sculpting and wanted to show her some sculptures in the garage that he had made. C, in an effort to be polite, followed the defendant to the doorway of the garage, where he proceeded to show her his sculptures and around the room, which contained a motorcycle and his dirt bikes. C did not enter the garage. Instead, she viewed the garage from the doorway.

After showing C the garage area, the defendant mentioned that he had more sculptures upstairs and invited C to see them. C agreed and followed the defendant upstairs. The defendant led C to his bedroom to show her a sculpture but, again, C remained in the doorway because she did not feel comfortable entering the room. At that point, the defendant told C that he had a projector in the bedroom and wanted to "Netflix and chill" with her. C said no because it was strange and that she did not know him like that. The defendant went to exit the bedroom, and C backed straight up against the wall in the hallway to give him space to walk by her. Instead of walking by C, who moved against the wall to let the defendant go by, the defendant walked toward her and put his hands on her hips. C stepped to the side and walked down the hallway away from the defendant and toward the dog gate.

C climbed over the dog gate and turned around when she reached the top step because she did not want her back to the defendant. The defendant had followed quickly behind her, grabbed her under her arms, and lifted her back over the gate, saying, "oh, you are so light, I could just pick you up." He then placed C on the couch in the living room and laid on top of her. While on the couch, the defendant put all of his weight on top of her and started kissing her neck. He then rubbed her breasts and genitals over her clothing. The defendant told C that she was "a bombshell," that he "couldn't pass up the opportunity," and that she was "being quarantined." C, who weighed significantly less than the defendant, was unable to move underneath him due to his weight. She did not put her arms around the defendant or kiss him back.

At some point, the defendant shifted his position on

C, which freed C's hand to allow her to utilize her cell phone. While the defendant continued to kiss her neck and rub her genitals, C accessed the Facebook messenger application on her phone and sent "help me" to her mother. The defendant then shifted his position a second time, which allowed C to slide out from underneath him and off the couch. She told the defendant that she was expecting a phone call and proceeded to walk toward the dog gate.

The defendant followed behind C to the dog gate. When C reached the gate, she once again turned toward the defendant because she was scared and did not want her back to him. The defendant used his leg to pin her against the gate. He then undid his waistband, exposed his penis, grabbed C's free hand, and moved it toward his penis. C ripped her hand away and pushed the defendant. As C attempted to climb over the dog gate, the defendant tugged at her V-neck shirt and bra, exposing C's breasts. The defendant proceeded to kiss and lick one of C's exposed breasts and her neck. C was eventually able to get over the gate, after which she ran downstairs to her mother's apartment and locked the door behind her. As she was running down the stairs, she heard the defendant yell, "fuck" in what sounded to her to be a very aggravated tone.

While C was attempting to get away from the defendant, she missed a call from her mother, who, at that time, had left band practice and was on her way to the defendant's house in response to C's Facebook message. When she secured herself in her mother's apartment, C frantically called her mother, told her what the defendant had done, and asked her to get her out of the house. C also messaged "hurry" to her mother using the Facebook messenger application.[6] When K arrived, C was exiting the house. K entered the entryway of the house and yelled up the stairs, but she did not see or hear the defendant. Her priority was getting C out of the house.

K drove her daughter back to M's house. On the way, K pulled into a parking lot to call the police because she did not want to call them in front of M and the other bandmates. K and C then drove to M's house and entered his basement. During the drive and in the basement, C was crying and trembling as she explained the details of the situation to her mother.

Less than one-half hour later, state troopers arrived at M's house. The state troopers spoke to C and K separately and took their written statements. C gave a statement to Trooper Kyle Cormier explaining, in detail, what had happened at the defendant's house, including that the defendant had licked and kissed her neck and breast. Cormier photographed the area of C's neck that she identified and swabbed it for forensic evidence. He also collected saliva from C's mouth so that the lab would have a "confirmatory sample" of C. Cormier did

not swab C's breast, which the defendant had also licked, because he did not want to further victimize her. He also did not collect any clothing from C. C did not want to go to the hospital and refused any medical treatment.

After collecting evidence from C, Trooper Cormier went to the defendant's residence and took photographs of several rooms in the home.[7] Cormier observed several items in the home that corroborated C's description, including a certain item on the coffee table, the couch in the living room, the dog gate, and the sculptures and projector in the bedroom.

State troopers arrested the defendant the next day. In September, 2017, an inspector collected a DNA sample from the defendant and later submitted it to the state forensic laboratory for comparative analysis. When the laboratory analyzed the samples collected from C's neck, it did not detect the presence of amylase, which is a protein found in human saliva. The negative result indicated that amylase either was not present or was present but was below a detectable level. When the same samples from the neck were tested for DNA, however, the laboratory determined that they contained a mixture of DNA profiles from C, the defendant, and one unknown individual. The results showed that the profiles detected in the sample were at least 100 billion times more likely to occur if it originated from C, the defendant, and one unknown individual than if it originated from C and two unknown individuals taken at random.

The defendant was charged with unlawful restraint in the second degree, sexual assault in the fourth degree, attempt to commit sexual assault in the third degree, and sexual assault in the third degree. A jury trial was held in December, 2021, and, on December 15, 2021, the jury found the defendant guilty on all charges. On March 18, 2022, the trial court, *Chaplin*, *J.*, imposed a total effective sentence of ten years of imprisonment, execution suspended after four years, followed by ten years of probation. The defendant was ordered to register as a sex offender for his lifetime. This appeal followed. Additional facts will be set forth as necessary.

I

On appeal, the defendant first claims that the prosecutor committed prosecutorial impropriety and deprived him of a fair trial when she made certain improper statements during closing arguments. Specifically, he complains that during the state's rebuttal closing argument, the state discussed general defenses in criminal cases, which suggested that he had a duty to present one of those defenses. The defendant also contends that the prosecutor's use of the phrase "nuts and sluts" during the state's rebuttal closing argument was "highly, highly inflammatory" and implied a burden of proof on the

part of the defense.[8] We are not persuaded.

We begin with the relevant legal principles. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of a constitutionally protected right. . . . [W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Internal quotation marks omitted.) *State* v. *Gary S.*, 345 Conn. 387, 407, 285 A.3d 29 (2022).

"It is well established that prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however, counsel] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of [her] office, [she] usually exercises great influence [on] jurors. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Courtney G.*, 339 Conn. 328, 341–42, 260 A.3d 1152 (2021).

The following additional facts are relevant to this claim. On December 15, 2021, closing arguments took place. After bringing the jury into the courtroom, the court explained: "At this point now, we're preparing to hear closing argument from counsel. What will happen is the state will go first. Then the defendant will argue through his counsel. Then the state will have a chance to make a rebuttal argument. Each side is given the same amount of time for argument. It's only the state that breaks its argument into two parts because they have the burden of proving the defendant guilty beyond a reasonable doubt. The arguments of counsel are not evidence. It is your recollection of the evidence that controls."

The state then proceeded to its argument, laying out its theory of the case, based on the evidence presented, in addition to discussing the charges. The prosecutor concluded by arguing, inter alia, that "when put together what [C] said and you look at the evidence in terms of the exhibits and whatnot, you will see that what she has given you is a credible account, and you will see by virtue of her testimony the elements are proven beyond a reasonable doubt."

Defense counsel then began his summation. He greeted the jury and stated that "[w]hat you just heard from the state is a nice . . . CliffsNotes version of the young female's testimony." Defense counsel further stated: "But let me rehash what the actual testimony was. So, this way everyone has a clear picture. She testified this March 29th date was not the first time she met my client. So, just to be clear, she was actually at the house three weeks prior to this actual date. You've heard [from the] state . . . here today that we have to look at the [veracity], the truth of the testimony. So, let's address that. The young lady testified that the first time she was staying overnight was on March 29, 2017. However, you heard testimony from her mother that, in fact, she stayed there the night before. So, right off the bat she wasn't being . . . truthful with you. If the state's going to ask that you believe her mother, and her mother's testified that, hey, she was here the night before. [The defendant] didn't know about it, but she was here the night before, then we have a veracity issue with this witness." Defense counsel then went through the defendant's version of the timeline and the evidence. Counsel concluded his summation by stating, inter alia, "[b]ut if you put your emotions aside, rely on your intellect, all we have here is we have a witness who was emotional, an actress, by the way, who lied about being there the night before. Who gave you a timeline and that timeline doesn't add up to her story. She tells you this guy made out on my neck, licked all over my neck heavily. But the evidence doesn't support that. And we have a coin flip upon the DNA. So, based on all of that, I ask you to find my client not guilty of all charges."

The prosecutor then began her rebuttal closing arguments by addressing some of defense counsel's arguments about the timeline of the events and the DNA and enzyme tests that had been conducted. She then made the following statements, which are at the heart of the defendant's claim on appeal: "So, usually in that case there are in criminal cases basically four defenses. It's alibi, somebody else did it, I did [it] I was justified, or I did it I was out of my mind. In sex cases, it's generally nuts and sluts is what they call it. Either the victim has had other, you know, situations that you're not gonna believe that she wasn't consenting or she's nuts. And the question is do you think [C] is nuts?

Because she'd have to be nuts to make all of this up. There's no reason for her to fabricate this, is there? What does she gain out of this?" Defense counsel did not object to these statements. The prosecutor then made a few additional remarks to the jury and argued that the state was confident that the jury would find that the state had proved its case beyond a reasonable doubt.

A

The defendant first claims that the prosecutor improperly discussed general defenses in criminal cases during the state's rebuttal argument. In his view, when the prosecutor stated that there were "basically four defenses" in criminal cases, "the state implied [that] the defendant has a duty to present one of those defenses, and thus to present a defense at all." We disagree.

It is well known that the state must prove beyond a reasonable doubt all the essential elements of the crimes with which a defendant is charged in order to obtain a conviction; *State* v. *Valinski*, 254 Conn. 107, 120, 756 A.2d 1250 (2000); and that prosecutors are not permitted to make statements that "distort the government's burden of proof . . . because such statements are likely to improperly mislead the jury." (Internal quotation marks omitted.) *State* v. *Courtney G.*, supra, 339 Conn. 357. A prosecutor may cross the line by arguing to the jury that the defendant is obligated to present evidence of his innocence. See id., 360 ("the prosecutor committed an impropriety when she informed the jury that [the victim's] testimony was 'unchallenged and uncontroverted' ").

But that is not what happened here. The prosecutor's statement that there are "basically four defenses" in criminal cases, in context, was a brief preface to the state's rebuttal argument that C did not have a motive to lie. Indeed, the statement, in context, was used simply to rebut defense counsel's asserted defense that C was lying about the incident and that the alleged incident never occurred.[9] Our courts have held that "the state may argue that a witness has no motive to lie." *State* v. *Warholic*, 278 Conn. 354, 365, 897 A.2d 569 (2006); see also *State* v. *Ancona*, 270 Conn. 568, 607, 854 A.2d 718 (2004) ("[i]t is permissible for a prosecutor to explain that a witness either has or does not have a motive to lie"), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005). At no point during the rebuttal argument did the state suggest that the defendant had a duty to present one of those defenses or a defense at all. See *State* v. *Frasier*, 169 Conn. App. 500, 519, 150 A.3d 1176 (2016) (prosecutor's statements during closing arguments about what defense theories defendant might present during his closing did not distort state's burden of proof), cert. denied, 324 Conn. 912, 153 A.3d 653 (2017). In fact, on multiple occasions during closing arguments, the prosecutor reminded the

jury that, before it could find the defendant guilty, it must find that the evidence presented proved the defendant's guilt beyond a reasonable doubt. Accordingly, we conclude that the statement was not improper.

B

The defendant next assails the prosecutor's use of the phrase "nuts and sluts" during her rebuttal argument. He argues that the statement was "highly, highly inflammatory" and that the statement "again implied a burden of proof on the part of the defense." He argues that the statement affected the fairness of the entire trial. We are not persuaded.

In context, it is clear that the prosecutor used the phrase "nuts and sluts" to advance the state's rebuttal argument that C did not have a motive to lie. Specifically, the prosecutor stated: "In sex cases, it's generally nuts and sluts is what they call it. Either the victim has had other, you know, situations that you're not gonna believe that she wasn't consenting or she's nuts. And the question is do you think [C] is nuts? Because she'd have to be nuts to make all of this up. There's no reason for her to fabricate this, is there? What does she gain out of this?"

These statements were clearly used to rebut the arguments that defense counsel had just made during his summation in which he suggested that C was lying about the incident and that the alleged incident never occurred. See *State* v. *Michael T.*, 338 Conn. 705, 728, 259 A.3d 617 (2021) ("[a]lthough we generally disapprove of remarks suggesting to the jury that it must conclude that a witness is deliberately lying and, by implication, evil, before it may question the witness' credibility, the prosecutor here was simply attempting to rebut the defendant's claim to that effect"). As the state's advocate, a prosecutor is permitted to argue the state's case forcefully, which includes arguments about the credibility of witnesses, "as long as her assertions are based on evidence presented at trial and reasonable inferences that jurors might draw therefrom." (Internal quotation marks omitted.) *State* v. *O'Brien-Veader*, 318 Conn. 514, 547, 122 A.3d 555 (2015). "[I]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Michael T.*, supra, 723–24. Despite the defendant's arguments to the contrary, we are not persuaded that the statement at issue implied any burden of proof on the part of the defense.

We also are not persuaded that this statement, in context, was "highly, highly inflammatory" to divert the jurors' attention from their duty to decide the case based on the evidence. On that front, our courts have explained, "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . We

have stated that such appeals should be avoided because they have the effect of diverting the jur[ors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jur[ors] to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Santiago*, 143 Conn. App. 26, 40, 66 A.3d 520 (2013). "An improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character . . . or a plea for sympathy for the victim or her family." (Citation omitted.) *State* v. *Long*, 293 Conn. 31, 59, 975 A.2d 660 (2009).

The defendant contends that the state's argument was highly inflammatory because "[s]ociety, particularly in the past few years after the MeToo movement, has developed significant sensitivity toward allegations of sexual abuse and complainants in those cases." He argues that the prosecutor's statement is "likely to inflame the emotional reactions of the jurors and cause them to reflexively side with the person being unfairly accused of being 'nuts' or a 'slut.' "

As the state points out, however, the defendant's argument "presumes that the jury, notwithstanding any argument from the state, is already basing its verdict on information outside the record for which he provides no supporting authority and is, in any event, improper." The state also correctly notes that, during voir dire, the parties had the opportunity to question jurors about any knowledge or experience they had with sexual assault or sexual harassment, presumably for the purpose of identifying those venirepersons who were particularly sensitive to issues of sexual abuse.

Although the defendant contends that the prosecutor's statement was "likely to inflame the emotional reactions of the jurors," the statement was not used as a personal attack on the defendant's character or as a plea for sympathy for C or her family, which are the types of factors our courts often consider when determining whether a prosecutor improperly appealed to the emotions of the jurors. See *State* v. *Michael T.*, supra, 338 Conn. 725 ("[a]n improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character . . . or a plea for sympathy for the victim or her family" (internal quotation marks omitted)). Rather, the prosecutor's statement, in context, invited the jury to assess C's credibility on the basis of the relevant evidence in the case, particularly the absence of any motive on her part to fabricate the allegations. Although we do not condone the statement used by the prosecutor and do not foreclose the possibility that the use of such language in front of a jury conceivably could constitute prosecutorial impropriety in a different context, we do not believe that its use in

this particular case diverted the jury's attention from its duty to decide the case on the evidence that was before it. Accordingly, we conclude that the statement did not arise to prosecutorial impropriety in this case.

Moreover, even if we were to assume for the sake of argument that the statement was improper, we still would not conclude that it deprived the defendant of a fair trial. See *State* v. *Gary S.*, supra, 345 Conn. 407 ("the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process" (internal quotation marks omitted)). In determining whether an impropriety deprived the defendant of a fair trial, this court considers whether "(1) the impropriety was invited by the defense, (2) the impropriety was severe, (3) the impropriety was frequent, (4) the impropriety was central to a critical issue in the case, (5) the impropriety was cured or ameliorated by a specific jury charge, and (6) the state's case against the defendant was weak due to a lack of physical evidence." *State* v. *Fauci*, 282 Conn. 23, 51, 917 A.2d 978 (2007), citing *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

First, the prosecutor's remarks were not frequent or severe. During the relatively lengthy closing argument, the prosecutor used the phrase "nuts and sluts" only once, followed by three sentences that each contained the word "nuts" a single time. These remarks occurred in only four sentences of the hundreds of sentences spoken by the prosecutor to the jury during closing arguments. Additionally, as to the severity, defense counsel did not object to the prosecutor's statements when they were spoken, request curative instructions, or move for a mistrial. See *State* v. *Warholic*, supra, 278 Conn. 398 ("we take into consideration whether defense counsel object[ed] to any of the improper remarks, request[ed] curative instructions, or move[d] for a mistrial" (internal quotation marks omitted)). And even if the remarks could be interpreted as implying a burden of proof on the part of the defense—a contention that we reject—the remarks were counterbalanced by the court's initial remarks to the jury explaining that the state had an opportunity for a rebuttal argument because the state has "the burden of proving the defendant guilty beyond a reasonable doubt." The remarks also were counterbalanced by the prosecutor, who reminded the jury multiple times during her argument that, before it could find the defendant guilty, it must find that the evidence presented proved the defendant's guilt beyond a reasonable doubt, and by the court, whose instructions to the jury made clear that "[t]he arguments of counsel are not evidence" and that "[t]he state has the burden of proving that the defendant is guilty beyond a reasonable doubt of the crime with which he is charged. The defendant does

not have to prove his innocence. This means that the state must prove beyond a reasonable doubt each and every element necessary to constitute the crime charged.”

We next consider whether the prosecutor's statements were central to critical issues in the case and whether the improprieties were invited by the defense. Although the credibility of C was a central issue and the remarks had some bearing on credibility, the defendant's reliance on centrality in support of his due process argument is counterbalanced by the fact that the defense, at least in part, invited the remarks by calling into question the veracity of C's testimony, arguing, inter alia, that the alleged sexual assault did not occur. See footnote 9 of this opinion; see also *State* v. *Gary S.*, supra, 345 Conn. 419 (“the defendant's reliance on centrality is counterbalanced by the fact that the defense, at least in part, invited the remarks”).

As to the strength of the state's case, we agree with the state that it presented strong direct and circumstantial evidence against the defendant. As the state notes, unlike in some sexual assault cases in which the state's case rests entirely on the victim's credibility, C's testimony in this case was corroborated by physical evidence, including the presence of the defendant's DNA on her neck and a contemporaneous Facebook message that C sent to her mother pleading for help. The state also presented testimony from Trooper Cormier about his observations and photographs that corroborated C's account of where each assault occurred in the defendant's house. Although we would not necessarily describe the evidence as overwhelming, the evidence was sufficiently strong not to have been overshadowed by the alleged improper remarks. See *State* v. *Courtney G.*, supra, 339 Conn. 365–66 (“[W]e have never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial [impropriety] did not deprive the defendant of a fair trial. . . . [T]he state's case was not so weak as to be overshadowed by the prosecutorial improprieties.” (Citation omitted; internal quotation marks omitted.)). On this record, we are confident that the defendant was not deprived of his due process right to a fair trial.

## II

The defendant next contends that his sentences stemming from his conviction of third degree sexual assault, in violation of § 53a-72a (a) (1), and fourth degree sexual assault, in violation of § 53a-73a (a) (2), violated the double jeopardy clause of the fifth amendment because (1) the “allegations that formed the basis of both charges stemmed from the same solitary event occurring on one date during one alleged interaction between the [defendant] and the complainant” and (2) the two offenses are the same under the test enunciated in *Blockburger* v. *United States*, 284 U.S. 299, 304, 52

S. Ct. 180, 76 L. Ed. 306 (1932). The defendant recognizes that his claim was not preserved in the trial court and, accordingly, seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[10] Although we agree with the defendant that the record is adequate for review and that his claim is of constitutional magnitude, we disagree with him that he can prevail under *Golding*'s third prong because we conclude that there was no constitutional violation. We address his arguments in turn.

The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb. . . ." U.S. Const., amend. V. The double jeopardy clause "prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense in a single trial." (Internal quotation marks omitted.) *State* v. *Porter*, 328 Conn. 648, 655, 182 A.3d 625 (2018). The double jeopardy clause is applicable to the states through the fourteenth amendment to the United States constitution. See *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

When a defendant is charged with the violation of two distinct statutes in a single criminal proceeding arising from a single underlying set of events, our courts have generally employed a two step analysis. "First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) *State* v. *Brown*, 299 Conn. 640, 652, 11 A.3d 663 (2011). If we determine that the charges do not arise from the same act or transaction, we need not proceed to the second step of the analysis. See *State* v. *Schovanec*, 326 Conn. 310, 329, 163 A.3d 581 (2017).

We start at step one. In determining whether the charges arise out of the same act or transaction, "it is not uncommon that we look to the evidence at trial and to the state's theory of the case . . . in addition to the information against the defendant, as amplified by the bill of particulars." (Citation omitted; internal quotation marks omitted.) *State* v. *Porter*, supra, 328 Conn. 662. "When determining whether two charges arose from the same act or transaction, our Supreme Court has asked whether a jury reasonably could have found a separate factual basis for each offense charged." (Internal quotation marks omitted.) *State* v. *Jarmon*, 195 Conn. App. 262, 284, 224 A.3d 163, cert. denied, 334 Conn. 925, 223 A.3d 379 (2020).

In the long form information, the state charged the defendant in count two with sexual assault in the fourth degree on the basis that "on or about March 29, 2017,

at or near [a certain residence on] Reed Road, Tolland, Connecticut, [the defendant] subjected another person ([C]) to sexual contact without her consent." Count four, which charged the defendant with sexual assault in the third degree, alleged that "on or about March 29, 2017, at or near [a certain residence on] Reed Road, Tolland, Connecticut, [the defendant] compelled another person ([C]) to submit to sexual contact by the use of force against her, to wit: using his superior physical strength, he pulled her shirt and bra down and licked her breast for his own sexual gratification." Although count four details the specific act that underlies the charge, count two does not. There was no bill of particulars to amplify the information. See *State* v. *Goldson*, 178 Conn. 422, 424, 423 A.2d 114 (1979) ("we . . . refer to the language of the information against the defendant, as amplified by the bill of particulars").

Because the long form information does not resolve the question before us, we look to the evidence presented at trial and to the state's theory of the case to determine whether each count arose from a separate act or transaction. See *State* v. *Porter*, supra, 328 Conn. 658 n.8. The defendant argues that the evidence shows that the charges arose out of the same act or transaction because "all of the conduct occurred at the same house in Tolland" and took place in "one room/hallway area." He argues that "[t]he complainant's testimony makes clear the criminal conduct was all one continuous course of action," stating: "The [defendant] began kissing her on the couch, she got up and he allegedly pulled her hand towards his penis, and then he allegedly pulled her top down. . . . When she left the same room as him, the conduct ended. . . . There was no intervening event during the conduct, and when there was an intervening event (the complainant leaving the room), the course of action ceased. The conduct also had the same motive, that being alleged sexual gratification. The court can also note that the conduct took place over a very condensed time period. The conduct began at or around 10:51 p.m., when the complainant was allegedly on the couch texting her mother. Only *after* 10:51 p.m. did the [defendant's] alleged forcible moving of the complainant's hand (the third degree offense) and touching of the complainant's breast (the fourth degree offense) begin. That conduct was ended before 11:02 p.m. when the complainant was out of the room and missed the phone call. Therefore, the criminal course of conduct in this case took place over approximately ten minutes or less." (Citations omitted; emphasis in original.) The defendant argues that this militates heavily toward concluding that the first prong is met.

The state counters by arguing that "[t]he information, evidence presented at trial, and the state's clearly expressed theory of the case, establish that each crime arose from separate acts committed at separate times, in separate locations, and in separate ways." In support

of this argument, the state argues that "C testified that the defendant, without her consent, put her on the sofa, laid on top of her, and rubbed her genitalia and breast over her clothing. . . . C was unable to move underneath the defendant because of the weight from the defendant's body and only freed herself after the defendant shifted positions." (Citation omitted.) In the state's view, the jury reasonably could have concluded from C's testimony and the photographs admitted into evidence that this incident, the fourth degree sexual assault, began and ended on the sofa in the living room of the defendant's home.

The state further argues that, "[c]onversely, the third degree sexual assault occurred after C freed herself from the sofa and attempted to go back downstairs to her mother's apartment. . . . The defendant pinned her against the gate leading to the basement stairs as she was trying to leave, at which point he pulled down her shirt and bra and licked her breast and neck. . . . C's testimony and the photographs taken inside the home establish that the two assaults took place in separate areas of the house . . . and they were separated by C's attempt to leave the area and retreat to her mother's apartment." (Citations omitted.)

On the basis of our review of the evidence presented at trial, we agree with the state that the offenses did not arise from the same act or transaction. In particular, as to the fourth degree sexual assault charge, the evidence shows that it began and ended on the living room couch. Specifically, there was a clear end to that incident—or act—when C slid out from underneath the defendant, stood up, and proceeded to walk back toward the dog gate, as she explained to the defendant that she was expecting a phone call.

The separate act—the basis of the third degree sexual assault charge—occurred when the defendant subsequently approached C at the stairs leading down to her mother's apartment and pulled down C's V-neck shirt and bra, exposing her breast, and licking her breast and neck.

The state's theory of the case at trial buttresses the conclusion that the charges stem from these separate acts or transactions. Indeed, during closing arguments, the prosecutor stated in relevant part: "The next crime is sexual assault in the fourth degree. And that takes place, again, on the couch. So, he's on top of her on the couch. Again, there's a size differential between the two of them. And the sexual contact here is the touching of her what we call intimate parts, her genital area. So, her genital area and her breast area. He's not touching them—this isn't a game of tag. This is for him to satisfy himself. He's fondling her over the clothes." As to the sexual assault in the third degree charge, the prosecutor stated in relevant part: "And so, the fourth count is, again, a sex assault in the third. And with the fourth

count is where he does complete it because he does pull her shirt down to lick her breast. . . . She's trying to get away from him. That he did it intentionally. This wasn't a joke. And that he used force, his physical superior strength."

Contrary to the defendant's contentions, the fact that the state charged the defendant with multiple offenses that occurred at the same residence in a relatively short time span does not necessarily mean that his convictions arose from the same criminal act or transaction. See, e.g., *State* v. *Scott*, 270 Conn. 92, 100, 851 A.2d 291 (2004) (concluding that sexual assault convictions were permissible, "irrespective of the brief period of time separating them"), cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005). Our courts have made clear that "[i]t is not dispositive in a double jeopardy analysis that multiple offenses were committed in a short time span and during a course of conduct that victimized a single person. Instead, the relevant inquiry focuses on whether each offense of which the defendant has been convicted and punished properly is based upon distinct criminal acts or transactions that occurred within that course of conduct." *State* v. *Urbanowski*, 163 Conn. App. 377, 393, 136 A.3d 236 (2016), aff'd, 327 Conn. 169, 172 A.3d 201 (2017); see id., 393–94 (collecting cases).

The defendant further suggests that, because both crimes shared the same motive (or intent) of sexual gratification, this fact counsels in favor of a conclusion that the convictions and resulting punishments arose out of the same act or transaction. But this contention lacks merit. As this court has explained, "[t]he test is not whether the *criminal intent* is one and the same and inspiring the whole transaction, but whether *separate acts* have been committed with the requisite criminal intent and are such as are made punishable by the [statutes]." (Emphasis in original; internal quotation marks omitted.) *State* v. *Bennett*, 187 Conn. App. 847, 853, 204 A.3d 49, cert. denied, 331 Conn. 924, 206 A.3d 765 (2019).

For the reasons previously explained, we are persuaded that the offenses in question did not arise from the same act or transaction and that, as a result, the defendant's convictions did not violate double jeopardy. As such, the defendant has failed to demonstrate that a constitutional violation exists under the third prong of *Golding*.[11]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] K has two other children, a daughter approximately two years older than C and a son who was then two years old. K's son was spending the night at his father's house the evening of March 29, 2017.

[2] K met with her band on Wednesdays to play various instruments and make music.

[3] C worked as a character actress for a local business, in which she would dress up as various Walt Disney princess characters and appear at children's

birthday parties.

[4] C testified that she previously had seen the defendant once while she visited her mother, but she was not familiar with him.

[5] The dog gate measures approximately 28.5 inches high and is positioned at the top edge of the staircase. The first step measures approximately eight inches below the dog gate.

[6] Out of anger, K sent messages to the defendant after hearing C's account of what occurred. The messages to the defendant stated, inter alia: "Jail Asshole"; "She's a kid you fuck"; "Here they come."

[7] After K picked up C from the house but before the state troopers arrived there to speak to the defendant, K sent an additional message to the defendant. Still angry, she threatened a lawsuit against him because he purportedly locked her and her two year old son out of the home after she failed to pay rent earlier that winter, claiming that he owed her three months of rent because of the lockout.

[8] Although defense counsel did not object to the challenged remarks, "under settled law, a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Ortiz*, 343 Conn. 566, 579, 275 A.3d 578 (2022).

[9] During defense counsel's closing argument, defense counsel argued, inter alia, that "[t]here's absolutely no physical evidence that my client touched her at all." He further argued that "[s]he tells you this guy made out on my neck, licked all over my neck heavily. But the evidence doesn't support that."

[10] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).

[11] "Because the defendant failed to show that the two charges arose out of the same act or transaction, there is no need to proceed to step two and perform a *Blockburger* analysis. See *State* v. *Porter*, supra, 328 Conn. 663 n.11." *State* v. *Jarmon*, supra, 195 Conn. App. 286.

———————————————